CHRISTOPHER STEFANONI ET AL. *v.*
IAN M. DUNCAN
(AC 25844)

McLachlan, Gruendel and Harper, Js.

---

174

Argued April 26—officially released November 1, 2005

*Margaret Stefanoni*, pro se, and *Christopher Stefanoni*, pro se, the appellants (plaintiffs).

*Donald Bruce Hill*, for the appellee (defendant).

*Opinion*

GRUENDEL, J. The plaintiffs, Christopher Stefanoni and Margaret Stefanoni, appeal from the judgment of the trial court, rendered after a trial to the court, concerning the existence of a prescriptive utility easement over a portion of their property and the extent of both a view restriction on and an access easement over the property of the defendant, Ian M. Duncan. On appeal, the plaintiffs claim that the court improperly held that (1) the defendant possesses a prescriptive utility easement over a portion of their property, (2) their easement over the defendant's property "for access to the waters of Holly Pond" does not include the rights to install a walkway and a dock, and to use for recreational purposes a widened portion of their easement, and (3) the language "the southwest bedroom" in the deeded view

restriction[1] means their second floor master bedroom rather than their ground floor southwest bedroom. We disagree with the plaintiffs' first claim, but agree with their second and third claims. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The following facts, as found by the court, are relevant to our resolution of the plaintiffs' appeal. "Holly Pond is a body of salt water forming a part of Long Island Sound located between the city of Stamford and the town of Darien. In the early part of the twentieth century, a dam was erected across the outlet where the pond empties into the sound. The dam prevents the waters of the pond from completely draining into Long Island Sound at low tide. However, the dam does not inhibit the waters of Long Island Sound from entering the pond as the tide rises. Accordingly, the level of Holly Pond is still subject to tidal variations. At low tide, the level of the water in the pond is two feet above the National Geodetic Vertical datum of 1929 (the standard reference elevation for the area). At mean high tide, the level of the water is 4.2 feet above the same datum. Although the pond is shallow, it is used for boating, to some extent.

"Holly Pond is irregularly shaped. The defendant's property is situated on a cove consisting of several lobes on the eastern shore of the pond. From the defendant's

---

[1] In their appellate brief, the plaintiffs refer to the view restriction as a view easement. The court, however, specifically held that it was a view restriction and not a view easement, the latter of which, if determined to exist, might entitle the plaintiffs to go onto the defendant's land to trim any foliage that obstructs their protected view. See *Schwartz* v. *Murphy*, 74 Conn. App. 286, 298 n.8, 812 A.2d 87 (2002), cert. denied, 263 Conn. 908, 819 A.2d 841 (2003). The plaintiffs have contested only the meaning of the language "the southwest bedroom" and not whether the court properly held that the pertinent language in the plaintiffs' and defendant's deeds creates a view restriction instead of a view easement. We therefore limit our review of the plaintiffs' claim to the meaning of the language "the southwest bedroom."

property, the main body of Holly Pond is visible through the channel connecting the cove to the main body and, to some extent, over the low-lying land of the peninsulas forming the cove. Except as blocked by the defendant's residence and trees, the plaintiffs enjoy a similar (albeit, more distant) view of the main body of the pond from the area of their residence. In front of the defendant's lot, the area of the foreshore[2] is very gently sloped, and it is approximately eighty feet in width. That area is largely covered with tussocks of tidal marsh grasses and, although firm, is somewhat uneven in contour.

"In 1972, Elizabeth Wall was the owner of property then known as 77 Nearwater Lane. The property then consisted of the residence now owned by the plaintiffs and situated on a narrow lot approximately 525 feet long by 82 feet wide. The lot was bounded on the east by Nearwater Lane, on the south by property of Margaret Weed Gioseffi, on the west by the waters of Holly Pond and on the north by property now owned by Calby. On June 27, 1972, Elizabeth Wall purchased the Gioseffi property, taking title in her name and in the name of her attorney, David S. Maclay, as trustee. The Gioseffi property was also a narrow lot approximately 580 feet long by 76 feet wide. That lot was bounded on the east by Nearwater Lane, on the south by a private road and property now owed by Judge, on the west partially by the waters of Holly Pond and by other property, and on the north by the property of Elizabeth Wall.

"In 1974, through a series of quitclaim deeds prepared by attorney Maclay, Elizabeth Wall and David S. Maclay, as trustee, transferred portions of the former Wall and Gioseffi properties among themselves. After the exchange of deeds, Elizabeth Wall owned the lot now

---

[2] In Ballentine's Law Dictionary (3d Ed. 1969), the term "foreshore" is defined as "[t]he territory lying between the lines of high water and low water, over which the tide ebbs and flows."

owned by the plaintiffs while Elizabeth Wall and David S. Maclay, trustee, owned the lot now owned by the defendant. These deeds created both the utility easement[3] and the access easement.[4]

"In late 1975, Elizabeth S. Wall and David S. Maclay, trustee, sold the lot now owned by the defendant to Doris Proctor and Barton Proctor. The deed conveying the lot was prepared by attorney Maclay. It described the property as shown on map no. 3915 recorded in the Darien land records. At that time, Elizabeth S. Wall was still the sole owner of the lot presently owned by the plaintiffs. The warranty deed to the Proctors included the utility easement as an appurtenance and noted that it was subject to the access easement. Map no. 3915 depicted the property now owned by the plaintiffs, the

[3] The deed conveying what is now the plaintiffs' property to Wall conveyed that property "[s]ubject to an easement appurtenant to the Releasors' property for water, power, telephone, sewer and similar utilities, together with a right of access for maintenance and repair purposes, along the southerly 10 feet of the land shown as being the property of Elizabeth S. Wall on [map no. 3915 in the Darien land records]." The deed conveying what is now the defendant's property to Wall and Maclay conveyed that property "[t]ogether with an easement appurtenant to the Releasees' property for water, power, telephone, sewer and similar utilities, together with a right of access for maintenance and repair purposes, along the southerly 10 feet of the land shown as being the property of Elizabeth S. Wall on [map no. 3915 in the Darien land records]."

[4] The deed conveying what is now the plaintiffs' property to Wall conveyed that property "[t]ogether with an easement of way appurtenant to the property of the Releasee running along the northerly boundary of the Releasors' premises 10 feet in width until it reaches a point 60 feet from the mean high water line of Holly Pond at which point it starts widening to a maximum width of 25 feet at said mean high water line, said easement being for access to the waters of Holly Pond, all as shown on [map no. 3915 in the Darien land records]." The deed conveying what is now the defendant's property to Wall and Maclay conveyed that property "[r]eserving, however, an easement of way appurtenant to the property of the Releasor running along the northerly boundary of the demised premises 10 feet in width until it reaches a point 60 feet from the mean high water line of Holly Pond at which point it starts widening to a maximum width of 25 feet at said mean high water line, said easement being for access to the waters of Holly Pond, all as shown on [map no. 3915 in the Darien land records]."

property now owned by the defendant, the location of the utility easement and the location of the access easement. The map also contained a notation showing that all of the defendant's property within 100 feet of the mean high water line was a 'Restricted Area (under § 486.2 of the Darien zoning regulations).' The deed to the Proctors also contained the following reservation creating the view restriction: 'Subject to the restriction that as viewed from a point 5 feet above the elevation of the existing floor of the southwest bedroom of the dwelling located on land of the grantors[5] adjoining the above described premises, the view of the water of the main body of Holly Pond shall not be significantly obstructed by any vegetation or structure (other than an open wire fence) at any point within an area 50 feet wide, running along the full length of the northerly boundary of said premise hereby conveyed.'

"The deed [to the Proctors, the defendant's predecessors in title] further recited that the property was conveyed 'together with riparian and littoral rights in the land lying below the mean high water mark of Holly Pond.' After this conveyance, Elizabeth S. Wall retained no interest in any property bordering Holly Pond and possessed no riparian or littoral rights with respect to the waters of Holly Pond.

"The Proctors erected a residence on their property and installed underground sewer, water and electric lines from Nearwater Lane to their property through the Wall property, a distance of approximately 260 feet. At Nearwater Lane, the utility lines were located within the ten foot wide deeded utility easement. However, approximately 120 feet from Nearwater Lane, the route of the utility line left the easement and continued

---

[5] In a footnote, the court noted that of the two grantors (Wall and Maclay), only Wall actually owned adjoining land. It held that this minor discrepancy did not obscure the obvious intention of the deed, at least with respect to the identification of the premises to be benefited by the view restriction.

through the Wall property to the Proctors' property. At the property line, the route of the utility lines was approximately twenty-five feet north of the northerly boundary of the utility easement.

"After installation of the Proctors' utility lines, the presence of the lines was evidenced above the ground by four sewer cleanouts, one manhole and an electrical box. The manhole, one of the cleanouts and the electrical box were located within the utility easement. One of the cleanouts was located in the Proctors' lot. Two of the cleanouts were located on the Wall property outside of the bounds of the utility easement. One of these cleanouts was within five feet of the northerly boundary of the easement, and the other was ten to fifteen feet north of the easement boundary. Each of the cleanouts was a vertical metal pipe six inches in diameter capped with a cover and rising approximately eighteen inches to two feet above ground level. At the time of the installation of the Proctors' utilities, plans were filed in the Darien building department showing that the underground utilities were located partially outside the deeded utility easement.

"In June, 1977, Elizabeth S. Wall sold the lot now owned by the plaintiffs to Stephen G. Bayer II. The warranty deed to Bayer was not prepared by attorney Maclay. That deed included both the access easement and the view restriction as appurtenances and recited that the premises conveyed were subject to the utility easement. The deed also contained the following additional language: '[T]ogether with riparian and littoral rights in the land lying below the mean high water mark of Holly Pond appurtenant to the premises.'[6]

---

[6] "It is fundamental that a grantor cannot effectively convey a greater title than he possesses." *Stankiewicz* v. *Miami Beach Assn., Inc.*, 191 Conn. 165, 170, 464 A.2d 26 (1983). Accordingly, the court determined that because "at the time of the deed to Bayer, Wall no longer owned property adjoining Holly Pond . . . *the riparian and littoral right clause of the deed from Wall to Bayer* was ineffective to create deeded riparian or littoral rights."

"On November 12, 1985, the defendant purchased his property from the Proctors. His warranty deed reflected the existence of the two easements and the restriction at issue in this case. At the time the defendant purchased his property, the entire neighborhood, including the plaintiffs' property and the defendant's property, was heavily wooded. The access easement was no more than a pathway through that wooded area.

"In 1998 and again in 2000, the defendant had water main problems and called his plumber, Kevin Ortega, to perform repairs within the utility easement. Ortega had no problem in 1998 in locating the utility lines because of the visible manhole cover and the aboveground electrical box and sewer cleanouts. However, in 2000, Ortega found that the plaintiffs had buried the electrical box and placed sod over the sewer cleanouts located on their lot.

"On March 1, 1999, the plaintiff Margaret Stefanoni purchased the Bayer property.[7] In late February, 2000, while the defendant was out of town, he received word from friends and neighbors regarding activities being performed by the plaintiffs. Without notice to their neighbors or obtaining the approvals required by the Darien zoning regulations, the plaintiffs undertook a massive clear cutting of the trees and vegetation on their property. In addition to the plaintiffs' work on their own property, the contractors hired by the plaintiffs performed considerable cutting within the access easement, on other portions of the defendant's lot and on the neighboring Calby property. Although the plaintiffs deny that the cutting was done with the intention of

(Emphasis added.) Therefore, the riparian and littoral right clause in the plaintiffs' deed is also ineffective to create deeded riparian or littoral rights.

[7] The court stated that "[i]n April, 2000, by means of quitclaim deeds through a 'straw man,' both plaintiffs became the record owners of the property."

improving their view of Holly Pond, the cutting had that result.

"The plaintiffs' activities took place within 1000 feet of the mean high water line of Holly Pond and consequently were in a regulated coastal area management zone under the Darien zoning regulations. Those regulations require that prior approval from the Darien planning and zoning commission be obtained for such activities within a coastal area management zone. On February 25, 2000, David J. Keating, the Darien zoning enforcement officer, wrote to Margaret Stefanoni, calling her attention to violations of the Darien zoning regulations. In the same letter, Keating demanded that steps be taken to prevent erosion, and that a restoration plan be presented to the planning and zoning commission for approval.

"Enforcement proceedings were subsequently brought by the town of Darien. The defendant and the Calbys intervened as parties to those proceedings. In September, 2000, those proceedings were settled by the parties. Under the terms of the settlement, the plaintiffs agreed, at their sole expense, to landscaping and planting on their property, the defendant's property and the neighboring Calby property in accordance with a plan approved by the town, the Calbys and the defendant. The plaintiffs implemented that plan, including the installation of stepping stones within the access easement. Before the stepping stones were placed, the defendant informed the plaintiffs that he no longer wanted them installed and requested that the surface of the access easement be left alone. However, the plaintiffs installed the stepping stones. . . .

"In the early summer of 2002, the plaintiffs and the defendant made some efforts to put their differences aside and avoid future controversies. The plaintiffs had acquired an outboard motorboat and expressed a desire

to install a permanent dock four and one-half feet wide and forty feet long extending into Holly Pond from the defendant's property and to tie up their boat to the dock. The defendant agreed to the erection of such a dock and to sharing the cost and use of it with the plaintiffs on an equal basis. A draft joint application to the Darien harbormaster was prepared by the plaintiffs and reviewed by the defendant and his attorney. Shortly prior to leaving on a trip to England, the defendant informed the plaintiffs that his attorney had advised him that he should be the sole legal owner of the dock because it was being erected on his land, but that such ownership would not affect the plaintiffs' use of the dock. The plaintiffs took this communication as a sign of bad faith on the defendant's part. Without informing the defendant of their intentions, the plaintiffs filed their own application with the Darien harbormaster for a permit authorizing a floating dock. When the defendant returned from his trip in three weeks, he found the plaintiffs' dock floating in the waters of Holly Pond in front of his property.

"The application that the plaintiffs filed with the harbormaster included an extract from a map prepared by the tax assessor of the town of Darien. The lot lines on the map make it appear that the plaintiffs were the owners, in fee simple, of the access easement area and thereby owned littoral rights in the waters of Holly Pond in front of the easement area.

"Over the next year, the defendant's attorneys and the plaintiffs exchanged correspondence with the Darien harbormaster and an assistant attorney general of the state regarding the legitimacy of the plaintiffs' permit. On May 8, 2003, assistant attorney general Paul K. Pernerewski advised the harbormaster that in his opinion, the rights granted to the plaintiffs in their deed entitled them to apply for and maintain their floating dock. That opinion, however, was based on the understanding that

the plaintiffs were granted, in addition to the rights set forth in the access easement, deeded riparian and littoral rights. The plaintiffs have since acknowledged that no such deeded riparian or littoral rights exist.[8]

"In connection with their proposed improvements in and adjacent to the access easement, the plaintiffs retained the services of Stanley Martin White, a professional engineer. White designed a ninety-six foot long walkway and dock that the plaintiffs propose to erect largely below the mean high water line at the end of the access easement. White testified that the walkway and dock would require pipe foundations to be sunk into the ground both within the access easement and below the mean high water line. The walkway and dock would be removed each fall and reinstalled each spring. White further testified that erection of the walkway and dock would require approval from the department of environmental protection and that if the plaintiffs obtained such an approval, it would be highly unlikely that the defendant would be able to obtain approval to erect his own dock within the area of his littoral rights." Additional facts will be set forth as necessary.

I

PRESCRIPTIVE UTILITY EASEMENT

The plaintiffs first claim that the court improperly concluded that the defendant acquired a prescriptive utility easement for underground sewer and water lines on a portion of their property outside that area already deeded to him as a utility easement. In support of their claim, the plaintiffs argue that the evidence was insufficient to establish one of the elements of a prescriptive easement, namely, that the defendant's use of the disputed portion of their property was open and visible for more than fifteen years. We disagree.

---

[8] See footnote 6.

"Whether a [prescriptive easement] has been acquired presents primarily a question of fact for the trier after the nature and character of the use and the surrounding circumstances have been considered. . . . When the factual basis of the court's decision is challenged, the reviewing court must determine whether the facts are supported by the evidence or whether they are clearly erroneous. . . . In such cases, the trier's determination of fact will be disturbed only in the clearest of circumstances, where its conclusion could not reasonably be reached." (Citations omitted; internal quotation marks omitted.) *Hoffman Fuel Co. of Danbury* v. *Elliott*, 68 Conn. App. 272, 275–76, 789 A.2d 1149, cert. denied, 260 Conn. 918, 797 A.2d 514 (2002). We therefore review the court's finding that the defendant's use of the disputed portion of the plaintiffs' property was open and visible for more than fifteen years to determine whether it was clearly erroneous.

"To establish an easement by prescription in accordance with General Statutes § 47-37,[9] [the party claiming to have acquired it] must prove the necessary elements by a preponderance of the evidence." *Hoffman Fuel Co. of Danbury* v. *Elliott*, supra, 68 Conn. App. 277. "In applying [§ 47-37, our Supreme Court] repeatedly has explained that [a] party claiming to have acquired an easement by prescription must demonstrate that the use [of the property] has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." (Internal quotation marks omitted.) *Waterbury* v. *Washington*, 260 Conn. 506, 577, 800 A.2d 1102 (2002). Because the plaintiffs contest only the court's determination that the defendant's use was open and visible for more than fifteen years, we limit our

---

[9] General Statutes § 47-37 provides: "No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years."

review to those elements. See *Hoffman Fuel Co. of Danbury* v. *Elliott*, supra, 277.

"The purpose of the open and visible requirement is to give the owner of the servient land knowledge and full opportunity to assert his own rights. . . . To satisfy this requirement, the adverse use must be made in such a way that a reasonably diligent owner would learn of its existence, nature, and extent. Open generally means that the use is not made in secret or stealthily. It may also mean that it is visible or apparent. . . . An openly visible and apparent use satisfies the requirement even if the neighbors have no actual knowledge of it. A use that is not open but is so widely known in the community that the owner should be aware of it also satisfies the requirement. . . . Concealed . . . usage cannot serve as the basis of a prescriptive claim because it does not put the landowner on notice. . . . A typical example of such a concealed use involves an asserted easement in an underground sewer or pipeline." (Citations omitted; internal quotation marks omitted.) *Waterbury* v. *Washington*, supra, 260 Conn. 577.

An underground sewer or pipeline may be considered open and visible for the purpose of establishing a prescriptive easement, however, where it has a visible outlet onto the surface. See *Ricci* v. *Naples*, 108 Conn. 19, 24, 142 A. 452 (1928) (suggesting that if underground sewer pipe had outlet onto surface and was visible, then open, visible element of prescriptive easement could be satisfied); *Alderman* v. *New Haven*, 81 Conn. 137, 139, 70 A. 626 (1908) (underground sewer on complainant's property considered open and visible for prescriptive easement purposes where connections from buildings on complainant's property to underground sewer were visible and apparent); *Jones* v. *Harmon*, 175 Cal. App. 2d 869, 879, 1 Cal. Rptr. 192 (1959) ("[C]ircumstances have sometimes arisen such as to give even buried conduits notoriety adequate to base a prescriptive ease-

ment. This has usually occurred where, even though the pipes themselves were not apparent, there were accessory installations on the surface which were plainly apparent." [Internal quotation marks omitted.]).

The court found that "[t]he underground utilities serving the defendant's property have been located partially outside the [deeded] utility easement since they were installed in 1976." It then concluded that "the use of the underground utilities has been continuous, uninterrupted and made under a claim of right for more than the fifteen year period required by § 47-37." The plaintiffs do not dispute any of those findings. They dispute, however, the court's determination that "the defendant and his predecessors in title have used [that portion of] the utility lines . . . [located] outside of the deeded utility easement in an *open [and] visible . . .* [manner] for more than the statutory fifteen year period . . . ." (Emphasis added.) Specifically, the plaintiffs contest the court's finding (1) that two particular sewer cleanouts located on their property above the surface of the ground, but outside the deeded utility easement, were open and visible from 1976 when they were installed until 2000 when the plaintiffs partially covered them with sod[10] and, therefore, (2) that the defendant's underground utility lines located outside of the deeded utility easement were inferentially open and visible for more than fifteen years. The plaintiffs argue that although the two sewer cleanouts in question have been located above the surface of the ground since being installed in 1976, the area of their property in which they are located, the southwest quadrant, at all relevant times has been heavily wooded and covered with dense undergrowth such that the two cleanouts have not been visible for the requisite amount of time. The plaintiffs

---

[10] The court stated in its memorandum of decision that the plaintiffs partially covered the sewer cleanouts with sod in 2002. The record, however, indicates the year to have been 2000.

argue that the two sewer cleanouts were not visible to them until approximately one year after they purchased their property when, in February, 2000, they cleared trees and overgrown vegetation from the southwest quadrant. They also argue that the defendant presented, at most, evidence that in 1989 a portion of their land was clear enough to render one of the two relevant cleanouts in the southwest quadrant open and visible, but no evidence of when that portion was initially cleared to render the aforementioned cleanout visible.[11] Because the defendant, according to the plaintiffs, offered only evidence of visibility in 1989 and not before then, and because they filed a trespass action against the defendant in September, 2003, which is less than fifteen years beyond 1989, they argue that the fifteen year open and visible requirement has not been satisfied.

We conclude that the court's determination that the two relevant sewer cleanouts were open and visible since 1976 has support in the evidence and is not clearly erroneous. If we assume (1) that prior to 1989 the aforementioned cleanout was never surrounded by grass; see footnote 11; but was instead located among trees and thick undergrowth, and (2) that the other relevant cleanout was also located among trees and undergrowth, as even the defendant's testimony suggests, the court still reasonably could have concluded that both cleanouts were visible since 1976. The court reasonably found that during installation in 1976, the plaintiffs' predecessor in title should have noticed that "[t]wo of

---

[11] The defendant introduced into evidence two still frames of a video that he testified represented fairly and accurately the condition in 1989 or 1990 of one of the two relevant sewer cleanouts located in the southwest quadrant of the plaintiffs' property. The still frames depict a grassy area with one sewer cleanout clearly protruding from the ground. In their appellate brief, the plaintiffs, on the basis of those still frames and the defendant's testimony, conceded that in 1989 or 1990, the "middle sewer cleanout," one of the two cleanouts located outside the deeded easement, was visible.

the cleanouts were located on the . . . property out-side of the bounds of the [deeded] utility easement." Moreover, the defendant testified that prior to the plain-tiffs' removal in February, 2000, of trees and vegetation from their yard, the southwest quadrant of their prop-erty, although "a wooded area [where] there were leaves on the ground . . . twigs [and] a bit of broken branch[es] . . . was quite clear and quite accessible." The defendant's wife also testified that prior to 1994, the southwest quadrant of the plaintiffs' property was "wood[ed] with trees . . . leaves and small twigs and branches" but that it "looked accessible." The defen-dant's plumber, Ortega, testified that in May, 1998, when his company performed work on the defendant's sew-age line, he saw both sewer cleanouts in question despite the fact that the southwest quadrant of the plaintiffs' property was wooded. He stated that the cleanout on the plaintiffs' property closest to the defen-dant's property, one of the two in question, "was out of the ground substantially" and responded negatively when asked if he needed to use a metal detector or any other machinery to locate the sewer cleanouts. He also testified that it was common for individuals installing sewer cleanouts to "leave them tall" when installing them in wooded areas and that those in question rose approximately one and one-half to two feet above the surface of the ground. The court was free to credit the testimony of those witnesses and, therefore, reasonably could have concluded that the two sewer cleanouts in question were open and visible since their installation in 1976, despite the fact that the area of the property in which they were located was wooded.

Moreover, as the court correctly noted, the plaintiffs were, as a matter of law, charged with the knowledge of the existence of a utility easement on their property. A utility easement was expressly referenced in both their deed and the defendant's deed thereby alerting

them to its existence. Although that explicit reference alone was not sufficient to alert the plaintiffs that the underground utility lines veered outside the deeded utility easement, their knowledge of the deeded utility easement and its parameters, combined with the visibility of the two sewer cleanouts on the plaintiffs' property outside those parameters, would lead any reasonable landowner to conclude that the underground utilities serving the defendant's property also veered outside the parameters of the deeded utility easement.

Accordingly, we conclude that there was sufficient evidence for the court to find that "the defendant and his predecessors in title have used [that portion of] the utility lines . . . [located] outside of the deeded utility easement in an *open* [*and*] *visible* . . . [manner] for more than the statutory fifteen year period . . . ." (Emphasis added.) The plaintiffs' claim therefore fails.

## II

## ACCESS EASEMENT

## A

## Walkway and Dock

The plaintiffs next claim that the court improperly concluded that their deed, which conveys to them "an easement of way" over the defendant's land "for access to the waters of Holly Pond," does not afford them the right to construct a walkway and dock extending from the west end of their easement over the mean high water line into the waters of Holly Pond. In support of their claim, the plaintiffs, citing *Orange* v. *Resnick*, 94 Conn. 573, 582, 109 A. 864 (1920), argue that the right of access is the fundamental riparian right[12] on which

---

[12] "[T]he term 'riparian rights' refers to the rights of owners of land abutting a stream, while the term 'littoral rights' refers to the rights of owners of land abutting surface waters of a lake or sea. However, the term 'riparian' is now used generally to describe a landowner who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water." 78 Am. Jur. 2d 386, Waters § 30 (2002).

all other riparian rights, including the right to wharf out, depend. Noting that riparian rights are alienable and "may be conveyed separately" from land abutting water; (internal quotation marks omitted) id., 580; and that "wharfing out is merely a mode of exercising the right of access"; id., 582; the plaintiffs contend that their deed, by conveying to them an easement for "access to the waters of Holly Pond," actually conveys to them the riparian right of access, which includes the right to wharf out.

In the alternative, the plaintiffs argue that if the court properly concluded that the deed did not convey riparian rights to them, then the court improperly failed to consider whether, despite not having riparian rights, they should be permitted to construct a dock because such a structure is reasonably necessary for the convenient enjoyment of their access easement. Under the circumstances of this case, we agree with the court that the conveyance of an easement for "access to the waters of Holly Pond" alone does not include the conveyance of littoral or riparian rights. We do not agree, however, that such a conclusion automatically precludes the plaintiffs from being able to construct a walkway and dock extending from the end of their easement into the waters of Holly Pond. Rather, we agree with the plaintiffs' second argument and, because certain legal and factual findings by the court make evident the need to permit the plaintiffs to install a walkway and dock, hold that they may do so subject to their compliance with all requirements as set forth in General Statutes § 22a-28 et seq., the Inland Wetlands and Watercourses Act, and in any other applicable regulations.

The plaintiffs' deed contains an express grant of "an easement of way" over the defendant's property "for access to the waters of Holly Pond . . . ."[13] The court

---

[13] The defendant's deed states that his property was conveyed to him "subject to . . . [a]n easement of way" over his property "for access to the waters of Holly Pond . . . ."

construed the access easement language in the plaintiffs' deed as conveying to them nothing more than the right to pass over the area of the easement to reach the waters of Holly Pond. It held that the deed did not grant the plaintiffs any of the riparian or littoral rights appurtenant to the defendant's property and, therefore, that the plaintiffs were precluded from constructing a walkway and dock at the end of their easement into the waters of Holly Pond because doing so would be an impermissible exercise of the defendant's exclusive littoral rights.[14]

"It is well settled that [f]or a determination of the character and extent of an easement created by deed we must look to the language of the deed, the situation of the property and the surrounding circumstances in order to ascertain the intention of the parties." (Internal quotation marks omitted.) *Coughlin* v. *Anderson*, 270 Conn. 487, 508, 853 A.2d 460 (2004). "[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference

---

[14] The court effectively treated the proposed walkway and dock as one structure. The court stated: "Although described as a 'walkway,' the structure would, in fact, be a pier. The total length of the structure would be ninety-six feet. The court finds that the 'walkway' would not, as alleged in the plaintiffs' complaint, be constructed 'over the marshland of the easement.' Only the first twenty feet would be located within the access easement. The remaining seventy-six feet would be below the mean high water line within the area of the defendant's littoral rights." It did not hold that construction of a walkway over the tidal wetland area of the easement could not be deemed a permissible improvement; rather, it held that *"as proposed,* [it was] not a permissible improvement within the access easement." (Emphasis added.) The court's statements suggest that if the proposed walkway terminated at or prior to the mean high water line and did not extend over it, then the walkway would have been a permissible improvement to the access easement.

to the trial court's factual inferences." (Internal quotation marks omitted.) *Bird Peak Road Assn., Inc.* v. *Bird Peak Corp.*, 62 Conn. App. 551, 557, 771 A.2d 260, cert. denied, 256 Conn. 917, 773 A.2d 943 (2001). "[W]hen interpreting the language of a deed the question is not what the parties may have meant to say, but the meaning of what they actually did say." *American Trading Real Estate Properties, Inc.* v. *Trumbull*, 215 Conn. 68, 75, 574 A.2d 796 (1990). "[T]he words [in the deed] are to be given their ordinary popular meaning, unless their context, or the circumstances, show that a special meaning was intended." (Internal quotation marks omitted.) *Cohen* v. *Hartford*, 244 Conn. 206, 215, 710 A.2d 746 (1998). "[I]f the meaning of the language contained in a deed or conveyance is not clear, the . . . court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity." *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, 239 Conn. 769, 780–81, 687 A.2d 1270 (1997).

As a preliminary matter, we note that Connecticut has not yet determined whether a grant of an easement of way "for access to the waters" of a body of water, *alone*, necessarily carries with it riparian rights, which, under the circumstances of this case, would include the right to construct, use and maintain a dock or a wharf. We are persuaded by reasoning found in *Badger* v. *Hill*, 404 A.2d 222 (Me. 1979), and *Gwynn* v. *Oursler*, 122 Md. App. 493, 712 A.2d 1072, cert. denied, 351 Md. 662, 719 A.2d 1262 (1998), that the grant of an easement of way "for access to the waters" of a body of water, *alone*, does not automatically "entitle the grantee the right to construct a dock or a pier." *Gwynn* v. *Oursler*, supra, 500; see *Badger* v. *Hill*, supra, 226; contra *Shore Village Property Owners' Assn., Inc.* v. *Dept. of Environmental Protection*, 824 So. 2d 208, 209 (Fla. App. 2002) (holding riparian rights, including right to build

dock, were implicitly included in granting of "easement and right of way for road purposes over . . . parcel of land . . . to the waters" of river). The courts in *Badger* and *Gwynn* essentially reasoned that if a deed does not expressly grant or deny riparian rights, but grants an easement for access to a body of water and does so without any explanation of what "access" means or includes, then it is ambiguous as to whether the easement entitles the grantee the right to install a dock or wharf. To resolve that ambiguity, they held that the court must apply "the general principles of law relating to the construction of ambiguous writings [including extrinsic evidence] . . . to discern the intentions of the grantor." (Citation omitted; internal quotation marks omitted.) *Gwynn* v. *Oursler*, supra, 501; see also *Badger* v. *Hill*, supra, 225–26. We find their reasoning to be persuasive, particularly in light of our previously discussed rules of construction.

Both the plaintiffs' deed and the defendant's deed describe the location and width of the "easement of way" in question. "Yet, the full scope of the use to be made of [an easement] requires evaluation of the purpose it was to serve." *Badger* v. *Hill*, supra, 404 A.2d 225. As to that, the deeds are completely silent about docks, wharves and walkways, and the only plain indication in the deeds is that access was being provided to the waters of Holly Pond.[15] "The achieving of access

---

[15] The plaintiffs' deed conveyed to them their property "*together with an easement of way* appurtenant to [the defendant's property] running along the northerly boundary of the demised premises 10 feet in width until it reaches a point 60 feet from the mean high water line of Holly Pond at which point it starts widening to a maximum width of 25 feet at said mean high water line, *said easement being for access to the waters of Holly Pond* . . . ." (Emphasis added.) The defendant's deed conveyed to him his property "*subject to* . . . *an easement of way* appurtenant to [his property] running along the northerly boundary of the demised premises 10 feet in width until it reaches a point 60 feet from the mean high water line of Holly Pond at which point it starts widening to a maximum width of 25 feet at said mean high water line, *said easement being for access to the waters of Holly Pond* . . . ." (Emphasis added.)

to a [body of water], however, is generally not the entire purpose for which a right of way providing such access is created. Also involved is why it was necessary, or desirable, to be able to reach the [body of water]. As to this aspect of purpose, the language of the deeds provides no answer. Thus, the language of the deeds may be unambiguous so far as it goes, but it does not go far enough in respects that are critical to the evaluation of the full scope, contemplated by the parties, of the use to be made of the [easement] of way. In such context a court may properly resort to extrinsic evidence of purpose." Id.; see also *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, supra, 239 Conn. 780–81 (court bound to consider extrinsic evidence for purpose of clarifying ambiguity).

Looking beyond the language in the plaintiffs' and defendant's deeds, we note first that Maclay, the attorney who prepared the deeds in which the access easement first appears, testified that the Wall family, when Wall owned the plaintiffs' property, used the access easement to go swimming and canoeing in Holly Pond. Second, like the trial court, we note that "any member of the public [may] use the waters of Holly Pond for any lawful purpose, including swimming, fishing, boating and skating,"[16] and that the plaintiffs have done so, via the easement, since purchasing their property.

---

[16] The court noted that "Holly Pond is a body of salt water forming a part of Long Island Sound" and that although a "dam prevents the waters of the pond from completely draining into Long Island Sound at low tide [it] does not inhibit the waters of Long Island Sound from entering the pond as the tide rises." It further noted that "the level of Holly Pond is still subject to tidal variations." Because "[t]itle to the shore of the sea, and of the arms of the sea, and in the soils under tidewaters is . . . in the State"; (internal quotation marks omitted) *Hartford Electric Light Co.* v. *Water Resources Commission*, 162 Conn. 89, 101, 291 A.2d 721 (1971); we agree with the court's conclusion, which the defendant did not contest, that any member of the public may use the waters of Holly Pond for the purposes enumerated above. See also *Richards* v. *New York, N. H. & H. R. Co.*, 77 Conn. 501, 504, 60 A. 295 (1905) (public has "rights of fishing, and navigation, and others of like nature" in cove connected to navigable river).

On the basis of those observations, we conclude that the purpose of the access easement was to allow the plaintiffs and their predecessors in title to pass over the area of the easement to reach the waters of Holly Pond so that, once reaching the waters, they could engage in any lawful activity, including swimming, fishing and boating. The court held as much when it stated: "The court finds that under the access easement, the plaintiffs have a right-of-way across a delineated portion of the defendant's property to reach the waters of Holly Pond, and nothing more. Upon reaching the waters of Holly Pond, the plaintiffs have the same rights as any member of the public to use the waters of the Holly Pond for any lawful purpose, including swimming, fishing, boating and skating."

The court, however, foreclosed the possibility that the plaintiffs could install a dock at the end of their easement. It reasoned that because "owners of upland adjoining the water have the exclusive, yet qualified, right and privilege to . . . wharf out from [their] land in a manner that does not interfere with free navigation . . . [a]ny exercise of claimed littoral rights by the plaintiffs would necessarily be a derogation of the defendant's otherwise exclusive rights." Although we agree that an upland owner who has not conveyed his riparian rights separately from his land is typically thought of as having the "exclusive" riparian right to wharf out into the waters abutting his property; *Rochester* v. *Barney*, 117 Conn. 462, 468, 169 A. 45 (1933); see also *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, 230 Conn. 764, 769, 646 A.2d 790 (1994); we conclude that when his land is burdened by an easement affording another property owner access to waters for boating and other legal purposes, the upland owner's "exclusive" right to wharf out may not be absolute. In other words, the upland owner's right to wharf out may be exercised by the easement

holder if installation of a wharf by the easement holder does not unreasonably increase the burden on the servient estate and is reasonably necessary for him to enjoy the easement and all of the purposes for which it was granted. See *Great Hill Lake, Inc.* v. *Caswell*, 126 Conn. 364, 367, 11 A.2d 396 (1940) ("owner of [an] easement has all rights incident or necessary to its proper enjoyment but nothing more"); see also *Kuras* v. *Kope*, 205 Conn. 332, 341–42, 533 A.2d 1202 (1987) (use of easement must be reasonable and as little burdensome to servient estate as nature of easement and purpose will permit; rights of easement holder and *rights of landowner* on which easement is located *are not absolute*, but are so limited, each by other, that there may be reasonable enjoyment of both); *Beneduci* v. *Valadares*, 73 Conn. App. 795, 803, 812 A.2d 41 (2002) (when easement not specifically defined, rule is that easement be only such as reasonably necessary and convenient for purpose for which it was created); *Klotz* v. *Horn*, 558 N.E.2d 1096, 1097 (Ind. 1990) ("issue is not whether the easement holder attains riparian ownership status, but rather, whether he is entitled to use the riparian rights of the servient tenant who has given him access to the body of water bordering the servient estate"),[17] on appeal after remand, 603 N.E.2d 870 (Ind. App. 1992).

[17] At trial, the plaintiffs relied on *Ezikovich* v. *Linden*, 30 Conn. App. 1, 618 A.2d 570, cert. denied, 225 Conn. 913, 623 A.2d 1023 (1993), in which this court held that an easement holder's installing a dock at the end of her easement was directly related to, and necessary for, the furtherance of the purposes of that easement. Id., 8. The court rejected the applicability of that case, however, because the deeds in this case, unlike the deeds in *Ezikovich*, do not contain a broadly worded grant "for general boating purposes . . . ." (Internal quotation marks omitted.) Id., 7. Although we agree that the deeds in this case do not contain such express language, the surrounding circumstances, as explained in the text of this opinion, make it clear that the access easement was conveyed for boating and other purposes. Accordingly, the lack of express language like that found in the *Ezikovich* deeds should not preclude an easement holder from being able to construct a dock where it is implicit from the surrounding circumstances that an access easement has been conveyed for boating purposes and, of course, when it is necessary to construct a dock.

Accordingly, the court should not have foreclosed the possibility that the plaintiffs may wharf out from the end of their easement simply because the defendant is the upland owner who possesses riparian rights. Given that the defendant's property is burdened by the plaintiffs' access easement, thereby rendering many of his property rights, including the right to wharf out, not absolute; see *Kuras* v. *Kope*, supra, 205 Conn. 342; the court should have determined whether the physical conditions of both the land on which the easement is located and the area of the foreshore render the installation of a walkway and dock reasonably necessary for the plaintiffs to reach the waters of Holly Pond so that they can engage in any lawful activity, including swimming, fishing and boating.

In *Kuras* v. *Kope*, supra, 205 Conn. 346, because certain factual findings by the trial court made evident the need to permit an easement to be graded,[18] our Supreme Court held that the trial court's refusal to permit grading of that easement was clearly erroneous. Specifically, our Supreme Court noted that "the trial court found that the right-of-way is 'but 10 feet wide as shown on the Davis survey,' that there are tracks that are 5 to 5 1/2 feet apart within the right-of-way . . . that there are many potholes with some being 12 to 15 inches deep . . . that the right-of-way is 'crowned in the middle in large part' and that there are 'certain stretches where the tracks are as much as 10 to 15 inches lower than the crown of the right-of-way.' " Id., 345–46. Like our Supreme Court in *Kuras*, we note certain legal and factual findings by the court in this case that make evident the need to permit the plaintiffs to install a walkway over the marshland area of their easement and to wharf out beyond the mean high water line.

---

[18] "A fair definition of the verb 'grade' . . . is [to] physical[ly] change . . . the earthen surface by scraping and filling on that surface to reduce it to common level." *Kuras* v. *Kope*, supra, 205 Conn. 345.

Specifically, we note that the court found that (1) "the plaintiffs have a right-of-way across a delineated portion of the defendant's property to reach the waters of Holly Pond," (2) the plaintiffs have "the right to use the access easement to transport equipment . . . including boats, fishing gear, etc., to Holly Pond," (3) "[t]he margins of Holly Pond consist of mud and marsh grasses,"[19] (4) "most of the access easement within sixty feet of the mean high water line lies within a tidal wetland," (5) "the area of the foreshore . . . is largely covered with tussocks of tidal marsh grasses and, although firm, is somewhat uneven in contour" and (6) "paving or otherwise improving the surface of the path within the access easement would not be an unreasonable exercise of the plaintiffs' rights."[20]

Accordingly, under the circumstances of this case, we conclude that the defendant's riparian right to wharf out does not preclude the plaintiffs from wharfing out[21]

---

[19] Among other photographs, the plaintiffs introduced into evidence, without objection, a photograph purportedly depicting Margaret Stefanoni with her feet sunken into the muddy foreshore during low tide.

[20] Although "it is for the trial court, not this court, to assess the credibility of witnesses"; *Evans* v. *Weissberg*, 87 Conn. App. 180, 183, 866 A.2d 667 (2005); we note that in both his testimony and his April 22, 2004 letter to the plaintiffs, White, the president of Ocean & Coastal Consultants in Trumbull, a group of engineers specializing in coastal environment consulting, expressed concerns about degradation to the marsh on the plaintiffs' easement as a result of foot traffic and boats being continually hauled across it to reach Holly Pond. We also note that the plaintiffs introduced into evidence, without objection, several photographs purportedly depicting the edge of the easement closest to Holly Pond. One photograph in particular purportedly depicts portions of the edge crumbling into the waters of Holly Pond.

Given such evidence and the court's own conclusion that "[t]he margins of Holly Pond consist of mud and marsh grasses," and "that most of the access easement within sixty feet of the mean high water line lies within a tidal wetland," this court, like White, has concerns that the plaintiffs' exercising of their "right to use the access easement to transport equipment . . . including boats," without a walkway and dock would be contrary to "the public policy of this state to preserve the wetlands and to prevent the despoliation and destruction thereof." General Statutes § 22a-28.

[21] Moreover, it is also worthwhile to note that just prior to the creation of the access easement, Wall owned both the defendant's and the plaintiffs'

and that they, subject to approval by the commissioner of environmental protection; see General Statutes § 22a-28 et seq.; may install a walkway over the tidal wetland area of their easement and a dock that extends below the mean high water line.[22]

In his brief, the defendant has expressed concern that if we hold that the plaintiffs can wharf out, then he may be precluded from exercising his riparian right to wharf out because it would be unlikely that the department of environmental protection would permit the installation of a second dock somewhere else along his property. We understand that improvements necessary to the effective enjoyment of an easement should not be permitted if they will unreasonably increase the burden on the servient estate. See *Somers* v. *LeVasseur*, 230 Conn. 560, 564, 645 A.2d 993 (1994). We also note, however, that the rights of an easement holder and the rights of a servient estate owner "are not absolute, but are so limited, each by other, *that there may be reasonable enjoyment of both.*" (Emphasis added; internal quotation marks omitted.) *Kuras* v. *Kope*, supra, 205 Conn. 342. Accordingly, we also hold that if the defendant's good faith application to the department of environmental protection for a permit to build a second dock somewhere else along his property were

properties. Accordingly, it is difficult to imagine that when Wall conveyed what is now the defendant's property to the Proctors subject to an easement for access to the waters of Holly Pond, the ability to wharf out, something she was entitled to do when she owned the defendant's property, was not implicitly a part of the easement.

[22] In *Kuras* v. *Kope*, supra, 205 Conn. 346, "[b]ecause . . . permitting [the grading] improvement require[d] additional factual determinations to be made before entering specific orders concerning such factors as the nature and extent of grading, [our Supreme Court] remand[ed] [the] issue to the trial court to conduct an evidentiary hearing for that purpose." Because the commissioner of environmental protection is responsible for determining what an acceptable structure on a wetland is; see General Statutes § 22a-28 et seq.; we do not remand the case to the trial court with instruction that it conduct an evidentiary hearing to make that determination.

to be denied solely because of the existence of the plaintiffs' dock, the defendant would have the right to use the easement in any way not inconsistent with the rights of the plaintiffs to its use. As to that issue, the court's judgment is therefore reversed.

## B

### Recreational Activities

The plaintiffs also claim that the court improperly held that they are not entitled to use for recreational purposes the widened out portion of their access easement that parallels the mean high water line. Specifically, the plaintiffs argue that because "[t]he easement grants the plaintiffs access to Holly Pond . . . to pursue recreational activities such as swimming, boating and fishing," they have the right "to place [there] temporarily a small boat such as a canoe or kayak during the daytime, to sit while supervising their children swimming, boating and enjoying the water and to stand while fishing or feeding the ducks." Having already concluded that the purpose of the access easement was to allow the plaintiffs and their predecessors in title to pass over the defendant's land in order to reach the waters of Holly Pond so that they could engage in any lawful activity, including swimming, fishing and boating, we conclude that it is evident that the plaintiffs should be allowed, for example, to sit in a portable chair along the edge of the easement to fish, to watch their children swim or to engage in any other lawful activity on and along the waters of Holly Pond. It is not evident, however, that the plaintiffs should be permitted to install permanent benches or other permanent furniture or to leave their canoes or kayaks there during the daytime when not using them. Accordingly, the court's judgment as to that issue is reversed to the extent that it is inconsistent with this opinion.

## III

## VIEW RESTRICTION

The plaintiffs also claim that the court improperly held that the language "the southwest bedroom" in the deeded view restriction means their second floor master bedroom instead of their ground floor southwest bedroom. The defendant's deed conveyed to him his property "subject to . . . [the] [r]estrictive covenant contained in a deed from Elizabeth S. Wall, et al, to Doris E. Proctor and Barton A. Proctor recorded in Book 366 at Page 249 of the Darien Land Records." The restrictive covenant in that deed stated that the defendant's property was "[s]ubject to the restriction that as viewed from a point 5 feet above the elevation of the existing floor of the southwest bedroom of the [plaintiffs'] dwelling . . . the view of the water of the main body of Holly Pond shall not be significantly obstructed by any vegetation or structure (other than an open wire fence) at any point within an area 50 feet wide, running along the full length of the northerly boundary of [the defendant's property.]" The plaintiffs' deed contained a similar provision conveying to them the right to such a view.[23] Noting that the plaintiffs' home has a southwest bedroom on the ground floor and a "large picture window on the southwest corner of the second floor . . . master bedroom," the court concluded that the language "the southwest bedroom" demonstrated a latent ambiguity, thereby permitting the court to look beyond the four corners of each deed to resolve the ambiguity. Relying on (1) the testimony of

---

[23] Specifically, the plaintiffs' deed conveyed to them their property "[t]ogether with the right that as viewed from a point 5 feet above the elevation of the existing floor of the southwest bedroom of [their] dwelling . . . the view of the water of the main body of Holly Pond shall not be significantly obstructed by any vegetation or structure (other than an open wire fence) at any point within an area 50 feet wide, running along the full length of the northerly boundary of the [defendant's] land to the west . . . ."

the attorney who prepared the deeds creating the view restriction, (2) the relative size of the windows in the ground floor and second floor rooms and (3) the respective views therefrom, the court held that the "southwest bedroom" referenced in the view restriction was the second floor master bedroom. Although we agree with the court that the existence of a latent ambiguity in a deed permits the court to look beyond its four corners to resolve the ambiguity, we disagree that the language "the southwest bedroom" demonstrated a latent ambiguity.

As previously noted, the construction of a deed presents a question of law over which our scope of review is plenary. In determining the location from which a particular view is to be protected as expressed in a deed, if the description of the location is clear and unambiguous, it governs, and the actual intent of the parties is irrelevant. See *Marshall* v. *Soffer*, 58 Conn. App. 737, 743, 756 A.2d 284 (2000) (determining location of boundary line). "A latent ambiguity arises from extraneous or collateral facts that make the meaning of a deed uncertain although its language is clear and unambiguous on its face." Id.; see also *F. & AK, Inc.* v. *Sleeper*, 161 Conn. 505, 510–11, 289 A.2d 905 (1971) (deeds contained latent ambiguity when, although certain on their face, they were rendered uncertain when compared to land they purported to describe). Comparing the language "the southwest bedroom" to the physical characteristics of the plaintiffs' home convinces us that there is no latent ambiguity. The record indicates that the plaintiffs' second floor master bedroom comprises the entire second floor and is, therefore, as much a northwest, northeast and southeast bedroom as it is a southwest bedroom. Accordingly, it cannot properly be considered as "the southwest bedroom." The ground floor bedroom in question, however, is distinctly located in the southwest corner of the plaintiffs' home

and not also in another corner of the home. Accordingly, only it can be described as the southwest bedroom.

The parties to the deeds in which the view restriction first appears may have intended that the view restriction protect the view from the second floor master bedroom and not from the ground floor southwest bedroom, but "when interpreting the language of a deed the question is not what the parties may have meant to say, but the meaning of what they actually did say." *American Trading Real Estate Properties, Inc.* v. *Trumbull,* supra, 215 Conn. 75. We therefore conclude that "the southwest bedroom" in the deeded view restriction means the ground floor southwest bedroom of the plaintiffs' home.[24]

The judgment is reversed to the extent that it improperly restricts the plaintiffs' rights to wharf out from the defendant's property and to use the area between the high and low water marks for recreational purposes in conjunction with their use of their easement for access to the waters of Holly Pond and to the extent that it improperly defines the location of the view restriction in the parties' deeds. The case is remanded with direction to render judgment on those issues consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion HARPER, J., concurred.

McLACHLAN, J., dissenting in part. I join fully in parts I and III of the majority's opinion. My judgment diverges from that of the majority in part II A at the point when it concludes that the right of the plaintiffs, Christopher Stefanoni and Margaret Stefanoni, to

---

[24] Moreover, we believe that the open wire fence exception to the view restriction supports our conclusion because there likely would be no need for such an exception if the second floor master bedroom was intended to be the location from which a view was to be protected.

access the waters of Holly Pond permits their construction of a dock connected to the land of the defendant, Ian M. Duncan. The record reveals that the trial court never found that a dock was reasonable or necessary to the plaintiffs' enjoyment of access to the water,[1] and I believe that the addition of a dock at the end of the contemplated walkway would unnecessarily burden the servient estate.

The right to access a navigable waterway, which evolved in a maritime society, is significantly different from the right to access waters that are not navigable. The cases cited by the majority that discuss the right to wharf out apply to navigable waters. See *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, 230 Conn. 764, 769, 646 A.2d 790 (1994); *Rochester* v. *Barney*, 117 Conn. 462, 468, 169 A. 45 (1933). "The right to wharf out derives from the right of access to 'navigable' or 'deep' water." *Port Clinton Associates* v. *Board of Selectmen*, 217 Conn. 588, 598 n.13, 587 A.2d 126, cert. denied, 502 U.S. 814, 112 S. Ct. 64, 116 L. Ed. 2d 39 (1991). Because Holly Pond does not appear to be navigable, these cases are inapplicable.

The question then becomes what are the plaintiffs' rights as granted by the deed to their property. It is clear that the "owner[s] of [an] easement [have] all rights incident or necessary to [their] proper enjoyment but nothing more." *Great Hill Lake, Inc.* v. *Caswell*, 126 Conn. 364, 367, 11 A.2d 396 (1940). I am not persuaded that the majority has abided by that principle in concluding that a dock is necessary to the plaintiffs' proper enjoyment of their easement. As the majority reports, the plaintiffs' predecessors used their access easement to go swimming in and canoeing on Holly

---

[1] The court did conclude, however, that "paving or otherwise improving the surface of the path *within the access easement* would not be an unreasonable exercise of the plaintiffs' rights." (Emphasis added.)

Pond. The record does not suggest that they were unable to do so without the benefit of a dock for mooring and launching their boats. Thus, although I agree that the trial court's six findings of fact enumerated in the majority opinion support the need for a walkway over the mud and marsh grasses to the edge of the water, I disagree that the plaintiffs need a dock in the water to effectuate the intention expressed in the deed.

Nor do I consider this a compromise decision. The facts found by the trial court support the need for a walkway, but do not support the need for a dock. The majority correctly notes that improvements necessary to effectuate the enjoyment of an easement should not be permitted if they unreasonably increase the burden on the servient estate. *Somers* v. *LeVasseur*, 230 Conn. 560, 564, 645 A.2d 993 (1994). Facts in the record make the imposition of a dock on the defendant's property unnecessarily burdensome. First, the seasonal nature of the plaintiffs' use will require that the dock be stored, presumably on the defendant's land, during the winter months. Second, the majority concedes that there is a possibility that the defendant will be unable to obtain permission to build a second dock along the edge of the pond. Given the acrimonious history between the parties, the majority's solution to this potential problem—that the parties share the dock—is an additional burden on the defendant's use and enjoyment of his land. Third and finally, the foreshore is, according to the trial court, somewhat uneven but firm. That would allow the plaintiffs to step into or to lower a boat safely and reasonably from the walkway into the foreshore of Holly Pond.

I find persuasive this court's reasoning in *McCullough* v. *Waterfront Park Assn., Inc.*, 32 Conn. App. 746, 755–58, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993), holding that the defendants' prescriptive easement did not entitle them to place docks on the

plaintiff's land. The court concluded that "the placement of the docks significantly burdens the plaintiff's use of the water bordering her property, thereby interfering with her littoral rights." Id., 758. Although the plaintiffs' easement in this case was acquired by deed rather than by prescription, that distinction is not material here. The prior owners' use, combined with the absence of language in the deed permitting the construction of a dock or more expansively describing the plaintiffs' right of access, compels me to take a narrower view of the plaintiffs' rights.

Accordingly, I respectfully dissent in part.