******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DAVIDSON D. WILLIAMS ET AL. *v.* GREEN
POWER VENTURES, LLC, ET AL.
(AC 45623)

Bright, C. J., and Elgo and Cradle, Js.

*Syllabus*

The plaintiffs, owners of real property in Bridgeport that is benefitted by
an express easement over a neighboring property, 145 Anchorage Drive,
sought, inter alia, a declaratory judgment defining the permissible uses
of the easement and an injunction prohibiting the defendants, G Co.,
the owner of 145 Anchorage Drive; A Co.; E and A, individuals who
owned or controlled G Co. and A Co.; and K Co., a building company,
from interfering with their use of the right-of-way over 145 Anchorage
Drive. The plaintiffs' property and 145 Anchorage Drive were originally
part of a single parcel of land. In the 1920s, M, the then owner, subdivided
the parcel into thirteen lots, as depicted on a map that was filed with
the town clerk. Lot 13, now known as 145 Anchorage Drive, is a strip
of land running from the end of Anchorage Drive to the waterfront. In
1927, M conveyed lot 4, now the plaintiffs' property, to F, the plaintiffs'
predecessor in interest, pursuant to a warranty deed that included
express easements providing that "the land designated as Lot No. 13 as
delineated on [the] map shall remain open as a right of way for the use
and benefit of the grantee" and that "the land on [the] map designated
as Anchorage Drive shall remain open for appropriate street purposes
. . . for the use and benefit of the grantee . . . ." The easements
granted in F's deed were referenced in all of the deeds thereafter con-
veying ownership of the plaintiffs' property, and all of the deeds con-
veying ownership of 145 Anchorage Drive indicated that the property
was subject to certain easements appurtenant to the other lots on the
map. For many years, the plaintiffs and other easement holders used
the right-of-way to access the waterfront, including traversing the length
of 145 Anchorage Drive on foot and in motor vehicles, to park vehicles on
the property, and to store and launch boats, kayaks, and paddleboards.
In 2017, G Co. purchased 145 Anchorage Drive and A Co. purchased
the adjacent property, 141 Anchorage Drive. Thereafter, K Co. began to
construct a large residence on 141 Anchorage Drive for E and A. In
connection with the construction, K Co. erected a temporary fence
and gate along the western borders of 141 Anchorage Drive and 145
Anchorage Drive, where those properties abut Anchorage Drive, which
blocked the plaintiffs' access to the right-of-way. G Co. and A Co. indi-
cated that, following the completion of construction, they intended to
allow the plaintiffs and other easement holders to access the right-of-
way through a pedestrian gate only and that access through a motor
vehicle gate would be limited to E and A. The plaintiffs commenced
this action, claiming that the defendants, by reason of their construction
activities and the building of the fence and other improvements, unrea-
sonably interfered with the plaintiffs' use and enjoyment of the easement.
The trial court found, inter alia, that the plaintiffs' right-of-way was
limited to foot passage only. It denied the plaintiffs' request for an
injunction, concluding that, once the construction work was completed,
the plaintiffs would have access to the entirety of 145 Anchorage Drive,
and it further concluded that, because the easement was limited to foot
passage, the fence and gate restricting motor vehicle access did not
interfere with the plaintiffs' rights. On the plaintiffs' appeal to this court,
*held* that, because the granting language used in F's deed was clear and
unambiguous when considered in light of the situation of the parties,
the properties, and the circumstances connected with the transaction,
this court's standard of review of the plaintiffs' claim was plenary, and,
as a matter of law, the plaintiffs' easement was not limited to foot
passage only: F's deed and the map expressly granted the easement
holders a general right-of-way in terms that were clear and unambiguous,
as neither document contained any specifications regarding the manner
in which 145 Anchorage Drive should be used or imposed any limitation
on the scope of the easement; moreover, because the trial court's con-

struction of the deed was incorrect as a matter of law, as that court failed to give effect to the language in F's deed that granted an open right-of-way in general terms without restrictions on its use, the trial court also erred in its determination of the scope of the easement as limited to foot passage, as the scope of the easement must be construed to include any reasonable use to which the land may be devoted; furthermore, in determining the scope of the easement, the trial court erred in limiting its consideration to what it viewed as the circumstances that existed at the time the easement was granted, rather than considering whether the plaintiffs' use of the easement was reasonable in light of the broad language of the grant, and its conclusion as to the import of those circumstances was incorrect because the trial court's reliance on the right-of-way over Anchorage Drive for its conclusion that the grantor intended to permit vehicular traffic on Anchorage Drive but not over 145 Anchorage Drive was misplaced, as the grantor limited the scope of the use over Anchorage Drive but did not include such a restriction in the easement over 145 Anchorage Drive, the extratextual evidence of the surrounding circumstances that the trial court relied on, including photographs from the early 1900s of the area surrounding 145 Anchorage Drive, did not support its conclusion, as the fact that the photographs did not display any vehicles or evidence of their use was not proof that M intended to prohibit passage via motor vehicle and the plaintiffs were not restricted to the reasonable uses that existed at the time the easement was granted, it was undisputed that 145 Anchorage Drive was large enough to accommodate recreation and parking, the plaintiffs and others had been using the lot for such purposes for decades, and there was an inference that M understood the easement over 145 Anchorage Drive to include the right to travel by motor vehicle, as he granted himself the same easement appurtenant to 141 Anchorage Drive as the only means of accessing that property by motor vehicle; accordingly, a new trial was required because the trial court, in failing to give proper effect to the unrestricted language of F's deed, failed to consider whether the plaintiffs' use of the easement was reasonable.

Argued May 8—officially released September 26, 2023

*Procedural History*

Action seeking, inter alia, an injunction prohibiting the defendants from blocking or interfering with the plaintiffs' easement, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the judicial district of Fairfield, where the named defendant et al. filed a counterclaim; thereafter, the matter was tried to the court, *Hon. George N. Thim*, judge trial referee; judgment in part for the defendants, from which the plaintiffs appealed to this court. *Reversed in part*; *further proceedings*.

*Eric D. Grayson*, for the appellants (plaintiffs).

*Colin B. Connor*, for the appellees (defendants).

*Opinion*

BRIGHT, C. J. The plaintiffs, Davidson D. Williams and Barbara R. Williams, appeal from the judgment of the trial court on their complaint against the defendants, Green Power Ventures, LLC (Green Power), 141 Anchorage, LLC, Edward Stern and Amy Stern (Sterns), and Keith J. Manca Building Company, LLC (Manca Building), and on the counterclaim filed by Green Power and 141 Anchorage, LLC. The plaintiffs sought a declaratory judgment, injunctive relief, and damages for trespass and nuisance arising out of the defendants' alleged interference with the plaintiffs' use of a right-of-way easement over Green Power's property, which abuts 141 Anchorage, LLC's property. In their counterclaim, Green Power and 141 Anchorage, LLC, sought a declaratory judgment defining the permissible uses of the easement. In resolving the parties' competing claims, the court concluded that the plaintiffs' easement is limited to foot passage only, that the plaintiffs were not entitled to injunctive relief or attorney's fees, and that the plaintiffs were entitled to $500 as "token damages" on their nuisance claim.[1]

On appeal, the plaintiffs claim that the court improperly (1) concluded that their easement is limited to foot passage only, (2) found that the fence and gate that the defendants placed across the right-of-way did not constitute an unreasonable interference with the plaintiffs' use of the easement, (3) found that the defendants did not engage in brazen and wanton conduct in connection with the planning, permitting, and development of their project that interferes with the plaintiffs' use of the easement, and (4) failed to consider evidence that the defendants are altering the location and dimensions of the easement. We agree with the plaintiffs' first claim and, accordingly, reverse in part the judgment of the trial court.[2]

The record reveals the following relevant facts and procedural history. The plaintiffs own a parcel of land located at 140 Grovers Avenue in the Black Rock neighborhood of Bridgeport. The parcel is benefitted by an express easement over 145 Anchorage Drive in Black Rock, which is bounded by Anchorage Drive on the west and by the waterline of Black Rock Harbor on the east. 145 Anchorage Drive is owned by Green Power. 141 Anchorage, LLC, owns 141 Anchorage Drive, which is a wedge shaped parcel directly to the south of 145 Anchorage Drive. The eastern border of 141 Anchorage Drive fronts on the waterline of Black Rock Harbor, and the tip of the wedge borders the end of Anchorage Drive. 141 Anchorage Drive also is benefitted by an express easement over 145 Anchorage Drive, which is the same as the plaintiffs' easement.

The Sterns directly or indirectly own or control both Green Power and 141 Anchorage, LLC. At present,

Manca Building is constructing a large, waterfront residence on 141 Anchorage Drive, in which the Sterns intend to reside after completion. Manca Building erected a fence and gate along the western borders of 141 Anchorage Drive and 145 Anchorage Drive where those properties abut Anchorage Drive, thereby blocking the plaintiffs' access to the right-of-way over 145 Anchorage Drive. The fence has signs that read "Keep Out" and "Private Property." The site plan for 141 Anchorage Drive includes a driveway over part of 145 Anchorage Drive with a motor vehicle gate and a pedestrian gate at the entrance to 145 Anchorage Drive, where the plaintiffs regularly had accessed the right-of-way. The intention of Green Power and 141 Anchorage, LLC, is to allow the Sterns to drive through the motor vehicle gate while restricting access for those who have a deeded easement over 145 Anchorage Drive to the pedestrian gate only. Prior to the defendants' construction of the gate and fence, the plaintiffs and other easement holders traversed the length of 145 Anchorage Drive in motor vehicles, parked vehicles on the way, and used the right-of-way to store and launch boats, paddleboards, and kayaks, and to watch Fourth of July fireworks.

Prior to the 1920s, 140 Grovers Avenue and 145 Anchorage Drive were part of a single parcel of land owned by the Bridgeport Yacht Club (Yacht Club property), and 141 Anchorage Drive was part of a separate parcel of land known as "The Anchorage" (Anchorage property).[3] On March 2, 1918, Kenneth W. McNeil purchased the Anchorage property from J. Percy Bartram. On April 17, 1922, McNeil acquired the Yacht Club property "together with all buildings, piers and other structures that may be on said land; and also all the interest, rights and privileges in connection with said land, including the land below [the] high-water mark extending from said premises to the main channel of Black Rock Harbor." In connection with his development of the Yacht Club property, McNeil subdivided the parcel into thirteen lots depicted on a map titled, "Map No. 1 Property of Kenneth W. McNeil, Black Rock, Bridgeport Conn" (McNeil map), which was filed with the town clerk on November 5, 1923. See Appendix 1 to this opinion.

On the McNeil map, lot 13—now known as 145 Anchorage Drive—is a strip of land running from the end of Anchorage Drive to the waterfront, where a pier is shown extending into Black Rock Harbor. As found by the trial court, lot 13 "is approximately twenty feet in width on the western border, 400 feet long on the northern and southern borders, and sixty-six feet [wide] on the eastern border. The western border is bounded by Anchorage Drive. The eastern border is bounded by the waterline of Black Rock Harbor." Lots 1 through 12 on the McNeil map were single-family residential lots.

McNeil began conveying the residential lots in April, 1924, and continued to do so until December 31, 1926, at which time he conveyed the remaining unsold lots— lots 2, 3, 4, 5, 6 and 13—to the Black Rock McNeil Corporation (McNeil Corporation), of which he was the president. Lot 13 was conveyed "subject to certain rights of way and easements appurtenant to all lots shown on [the McNeil] map." The McNeil Corporation owned lot 13 until May, 2017, when Patrick Fenn purchased it at a public auction by the Bridgeport tax collector for delinquent taxes. In September, 2017, Fenn sold lot 13 to Green Power, subject to "[t]he rights of others to pass and repass over Lot No. 13 as granted by Deed of Easement dated January 10, 1928 and recorded in Volume 583, Page 487 of the Bridgeport Land Records. NOTE: This easement is an appurtenance to all Lots (Lots 1 through 12) as set forth on [the McNeil map]. (affects 145 Anchorage Drive)."

On June 10, 1927, the McNeil Corporation conveyed lot 4—now known as 140 Grovers Avenue—to Irene Wren Floeckher, the plaintiffs' predecessor in interest, by warranty deed (Floeckher deed). The Floeckher deed granted an express easement providing: "That that part of the land designated as Lot No. 13 as delineated on [the McNeil] map shall remain open as a right of way for the use and benefit of the grantee as appurtenant to the land hereby conveyed in common with all other present and future owners of all the parcels of land as delineated on [the McNeil] map and also the land described in a certain deed recorded in Volume 430, Pages 272–[7]3 of said Land Records." The Floeckher deed also provided "[t]hat that part of the land on [the McNeil] map designated as Anchorage Drive shall remain open for appropriate street purposes and user[4] for the use and benefit of the grantee as appurtenant to the land hereby conveyed, in common with all other present or future owners, of all the parcels of land as delineated on [the McNeil] map and also the land described in a certain deed recorded in Volume 430, Pages 272–[7]3 of the Bridgeport Land Records." (Footnote added.) The grants of easements in the Floeckher deed are referenced in all deeds thereafter conveying ownership of 140 Grovers Avenue. On November 23, 1987, Davidson Williams purchased 140 Grovers Avenue, conveyed by warranty deed, and, in December, 1996, he quitclaimed the property to himself and his wife, Barbara Williams.

The property located at 141 Anchorage Drive was not part of the McNeil map subdivision, as it remained an undivided part of the Anchorage property. On or about May 9, 1927, McNeil subdivided the Anchorage property into two parcels. He conveyed the larger of the two parcels to Robert S. Hincks and retained for himself the smaller parcel, known today as 141 Anchorage Drive. See Appendix 2 to this opinion. On January 10,

1928, McNeil, as president of the McNeil Corporation, executed a "Deed of Easement" conveying to McNeil and his heirs and assigns, "the perpetual right, privilege and easement of using . . . those certain parcels of land . . . designated as Anchorage Drive and Lot No. 13 as delineated on [the McNeil map] . . . ."[5] Floeckher and the owners of the other lots depicted on the McNeil map signed the deed as cograntors of the easement. The deed provided in pertinent part: "That the parcel of land designated as Anchorage Drive shall be for appropriate street purposes and user and that the parcel of land designated as Lot No. 13 shall be a right of way for the use and benefit of said Grantee, his heirs and assigns, as an appurtenance to all or any part or parts of that portion of that certain parcel of land described in that certain deed to said Kenneth W. McNeil dated March 2nd, 1918 and recorded in Volume 380 Pages 341 and 342 of the Bridgeport Land Records, which is still owned by said Grantee, in common, however, with all the present and future owners of all the parcels of land as delineated on the [McNeil] map hereinbefore referred to."[6] This deed of easement is referenced in all deeds thereafter conveying ownership of 141 Anchorage Drive. In April, 2012, Fenn purchased 141 Anchorage Drive, and 141 Anchorage, LLC, purchased 141 Anchorage Drive from Fenn in September, 2017, when Green Power purchased 145 Anchorage Drive.

The plaintiffs brought the present action by way of a four count complaint filed August 18, 2021. The plaintiffs alleged, inter alia, that the defendants had, by reason of their construction activities and building of the fence, gate, and other improvements on 145 Anchorage Drive, unreasonably interfered with the plaintiffs' use and enjoyment of the easement. In the first count, the plaintiffs sought a declaratory judgment that the easement is valid and enforceable in accordance with its terms and that the defendants had interfered with the plaintiffs' easement. In the second count, the plaintiffs sought a temporary injunction restraining the defendants from interfering with the plaintiffs' easement and requiring that the defendants take down the fence and gate, cease and desist all construction activity on the easement, and remove all structures erected on the easement. In counts three and four of the complaint, the plaintiffs alleged that the defendants' actions constituted a trespass on their property and a nuisance. In their prayer for relief, the plaintiffs also sought monetary damages and attorney's fees.

The defendants filed an answer on October 20, 2021, denying the plaintiffs' material allegations and raising several special defenses. Green Power and 141 Anchorage, LLC, also filed a counterclaim alleging that the deed the plaintiffs had obtained to 140 Grovers Avenue in 1987 provided only " 'for ingress and egress over and across the premises described as . . . Lot no. 13 [i.e., 145 Anchorage Drive] . . . .' " (Emphasis omitted.)

Thus, the defendants contended that the plaintiffs' deed does not provide them with the right to (1) use the easement for the purpose of recreational activities, (2) access the shoreline, (3) access the water, or (4) use the easement in furtherance of water related activities. Green Power and 141 Anchorage, LLC, sought a declaratory judgment so as to definitely determine, inter alia, the permissible uses of the easement, whether the holders of the easement have the right to access, use, and traverse the easement in motor vehicles, and whether "the holders of the easement have the right to use the easement to access the beach and/or shoreline and/or waterfront, and, if so, whether . . . the easement holders have the right to use the easement for the purpose of conducting and/or participating in water related activities and/or transporting vehicles or equipment across the easement in furtherance of such purposes."

The matter was tried before the court, *Hon. George N. Thim*, judge trial referee, over the course of four days in January and February, 2022. Thereafter both parties filed posttrial briefs. On the basis of the language of the Floeckher deed expressly granting the easement, the location of lot 13, and the surrounding circumstances of the original grant, the plaintiffs argued that the original parties to the grant clearly intended that the easement provide easement holders with "dedicated access to the waterfront . . . for their common use and benefit." In particular, the plaintiffs contended that "[t]he purpose of the easement was to provide the plaintiffs with access to the waterfront, including vehicular access, for various water based recreational uses including, without limitation, boating, sailing, kayaking, fishing and for general use and enjoyment . . . ." They further argued that the words "shall remain open" in the grant mean that no gates or other obstructions on the right-of-way are permissible and that the words "in common with" mean that no easement holder has any greater or lesser rights than the other easement holders. The defendants, contrastingly, argued that the easement is solely for the right to pass and repass over 145 Anchorage Drive and that "the explicit and unambiguous language of [the plaintiffs'] deeded right-of-way over 145 Anchorage [Drive] does not permit or contemplate using the right-of-way to launch boats or for other recreational activities . . . ."[7]

The court issued a memorandum of decision on May 24, 2022, finding that the easement was originally intended to provide access to the shore of Black Rock Harbor but that "the plaintiffs' right of passage is limited to foot passage . . . ." The court then denied the plaintiffs' request for a temporary injunction, concluding that, "[o]nce the construction work is completed, the plaintiffs will have access to the entire parcel. In balancing the equities, the minor inconvenience to the plaintiffs does not weigh in favor of this court's stopping the defendants' use of lot 13." The court further con-

cluded that, because the plaintiffs' easement is limited to foot passage, a gate that controls passage by motor vehicle does not interfere with their rights. Similarly, the court found that the construction of a locked pedestrian gate would not unreasonably interfere with the plaintiffs' right of passage because the defendants would provide persons who have a right to use the right-of-way with the combination to the pedestrian gate.

In addition, the court determined that "[t]he defendants have obtained from the Connecticut Department of Energy and Environmental Protection a license to erect a dock at 141 Anchorage Drive. The license is subject to various conditions and states, in part, that prior to construction of the work authorized by the license 'a Declaration of Restriction on the City of Bridgeport Land Records for the properties located at 141 and 145 Anchorage Drive shall be recorded. . . . The dock authorized herein [at 141 Anchorage Drive] shall be the sole means of littoral access for the lots located on 141 and 145 Anchorage Drive.' " The court concluded that, because "[t]he grantor of the easement clearly intended to give its grantees the right to cross over the ground of lot 13 to the shore of Black Rock Harbor," "[f]iling the proposed declaration on the land records will interfere with the plaintiffs' right of passage to the shore." Accordingly, the court granted the plaintiffs' request for an order barring the defendants from filing the declaration in its present form.[8]

The court also found in favor of the defendants on the trespass claim because the plaintiffs are not in exclusive possession of the property. On the nuisance claim, however, the court found that the plaintiffs' use and enjoyment of their easement had been temporarily harmed by the construction project and awarded them "token damages" in the amount of $500 because the evidence did not provide a basis for measuring specific damages. Last, the court determined that the plaintiffs were not entitled to attorney's fees because the defendants had not engaged in deceitful and wanton behavior that would justify such an award.

On June 13, 2022, the plaintiffs filed a motion to reargue/reconsider, which the court denied on June 28, 2022. On June 30, 2022, the plaintiffs filed the present appeal.[9] Additional facts will be set forth as required.

Before we address the plaintiffs' claims on appeal, we set forth the following legal principles governing easements. "It is well settled that [a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the rules authorized by the easement. . . . [T]he benefit of an easement . . . is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. . . . [E]asements are not ownership interests but rather privileges to use [the] land of

another in [a] certain manner for [a] certain purpose . . . . Except as limited by the terms of the servitude . . . the holder of an easement . . . is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. . . . Likewise, [e]xcept as limited by the terms of the servitude . . . the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude." (Citations omitted; internal quotation marks omitted.) *57 Broad Street Stamford, LLC* v. *Summer House Owners, LLC*, 184 Conn. App. 834, 841, 195 A.3d 1143 (2018).

"The use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit. . . . Ordinarily when [judicial] opinions speak of the use of an easement, it arises in right-of-way cases. Thus use frequently involves the amount of traffic over the easement or alterations to the land to make it passable. . . . This is not to overlook, however, that [t]he owner of an easement has all rights incident or necessary to its proper enjoyment, [although] nothing more." (Citations omitted; internal quotation marks omitted.) *Kuras* v. *Kope*, 205 Conn. 332, 341, 533 A.2d 1202 (1987).

Significantly, "the full scope of the use to be made of [an easement] requires evaluation of the purpose it was to serve." (Internal quotation marks omitted.) *Stefanoni* v. *Duncan*, 92 Conn. App. 172, 193, 883 A.2d 1271 (2005), rev'd in part on other grounds, 282 Conn. 686, 923 A.2d 737 (2007). "[A]ppellate case law . . . [has] used the terms 'location,' 'scope,' and 'use' somewhat interchangeably. . . . [Our Supreme Court has] read scope and use as having similar meanings insofar as they involve 'what [the] holder [of the easement] may do with it, [and] the purposes for which it may be used.' " (Citation omitted.) *Deane* v. *Kahn*, 317 Conn. 157, 166 n.5, 116 A.3d 259 (2015).

In the present case, it is undisputed that the plaintiffs hold a valid, deeded easement over lot 13, which covers the entirety of the property and runs from Anchorage Drive to the mean high-water mark of Black Rock Harbor. What is disputed are the rights granted pursuant to that easement and the use the plaintiffs may make of it.

On appeal, the plaintiffs claim that (1) "[t]he trial court's conclusion that the grantor of the plaintiffs' easement intended the right-of-way to be limited to foot passage only was based on a flawed interpretation of the [Floeckher] deed, the situation of the property, and the surrounding circumstances," and (2) the court erred in finding that the defendants' fences and gates across the right-of-way and their exclusive use of the right-of-way for construction purposes did not constitute interference with plaintiffs' easement. The plaintiffs

contend that a proper interpretation of the Floeckher deed reveals that the clear purpose of the easement was to provide easement holders with littoral access to Black Rock Harbor for recreational use. The plaintiffs further maintain that, because the easement was unambiguously granted in general terms, it may be used for any purpose reasonably necessary for the party entitled to use it; see *Mackin* v. *Mackin*, 186 Conn. 185, 189, 439 A.2d 1086 (1982); including the reasonable use of vehicles, trailers, and dollies on and across the right-of-way for purposes of accessing the waterfront for recreational use.

In contrast, the defendants maintain that the question at trial related not to an interpretation of the language of the easement but, rather, to the scope of what was permitted under the easement, including what constituted a reasonable use of the easement. They argue that the court's determination that "[t]he grantor of the easement clearly intended to give its grantees the *right to cross over the ground of lot 13* to the shore of Black Rock Harbor" and that "such right is limited to foot passage and does not include the right to launch boats or otherwise use for recreational purposes," was not clearly erroneous and did not grant the plaintiffs littoral access to Black Rock Harbor.[10] (Emphasis in original; internal quotation marks omitted.) The defendants assert that the easement simply grants the plaintiffs and other easement holders the right to walk the length of lot 13 from Anchorage Drive to the shore of Black Rock Harbor, where they may stand and observe the water, and walk back. According to the defendants, the scope of the easement is therefore limited such that the plaintiffs may not sit or picnic at the shore within the boundary of lot 13. To the extent that lot 13 provides access to a beach beyond the lot's property line, the defendants agree that the plaintiffs have the right to traverse lot 13 to access that beach.

Because the parties frame the issues differently, they disagree as to the proper standard of review. The defendants argue that, rather than challenging the trial court's determination of the grantor's intent from the language of the deed, the plaintiffs "are appealing a determination of the scope of the right-of-way and what constitutes the reasonable use thereof." Thus, the defendants contend that the clearly erroneous standard is the proper standard of review on appeal.

The plaintiffs, however, note that they sought a declaratory judgment finding that "the easement is valid and enforceable *in accordance with its terms*" and assert that "this was not a case of the court needing to determine the metes and bounds of the easement for purposes of scope, or the use of the easement as if it was an implied easement. . . . The plaintiffs' easement, which is the same as 141 [Anchorage, LLC's] easement, [is] expressed in unambiguous terms; thus,

the standard of review is plenary." (Citation omitted; emphasis added.)

Both this court and our Supreme Court have noted that Connecticut case law regarding the standard of review in easement cases "is somewhat confusing . . . ." (Internal quotation marks omitted.) *Deane* v. *Kahn*, supra, 317 Conn. 167 n.6, quoting *Sanders* v. *Dias*, 108 Conn. App. 283, 290, 947 A.2d 1026 (2008). In an attempt to provide some clarity, our Supreme Court, in *Deane* v. *Kahn*, supra, 167 n.6, stated: "Our scope of review as to the intent behind language in a deed is plenary. . . . Although the intent to create an easement by deed is therefore a question of law over which our review is plenary . . . if the language of the deed is incomplete or ambiguous regarding the location, scope, or use of the easement, the trial court's resolution of those issues represents a question of fact subject to the clearly erroneous standard of review. . . . In the absence of unambiguous or complete language in the deed, therefore, determining the location, scope, and use of an express easement is a fact-intensive inquiry properly subject to the clearly erroneous standard of review." (Citations omitted.)

Nevertheless, "when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences. . . . The meaning and effect of the [language in the deed] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances. . . .

"Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed . . . and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence. . . .

"In the construction of a deed or grant, the language is to be construed in connection with, and in reference to, the nature and condition of the subject matter of the grant at the time the instrument is executed, and the obvious purpose the parties had in view. . . . [I]f the meaning of the language contained in a deed or conveyance is not clear, the trial court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity. . . .

"Furthermore, [a] reference to [a] map in [a] deed, [f]or a more particular description, incorporates [the

map] into the deed as fully and effectually as if copied therein. . . . [T]he identifying or explanatory features contained in maps referred to in a deed become part of the deed, and so are entitled to consideration in interpreting the deed as though they were expressly recited therein. . . .

"Finally, we note that [t]he fact that servitudes are intended to bind successors to interests in the land, as well as the contracting parties, and are generally intended to last for an indefinite period of time, lends increased importance to the writing because it is often the primary source of information available to a prospective purchaser of the land. The language should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved. Searching for a particular meaning adopted by the creating parties is generally inappropriate because the creating parties intended to bind and benefit successors for whom the written record will provide the primary evidence of the servitude's meaning." (Citations omitted; internal quotation marks omitted.) *Simone* v. *Miller*, 91 Conn. App. 98, 108–10, 881 A.2d 397 (2005); see also *Rocamora* v. *Heaney*, 144 Conn. App. 658, 665–66, 74 A.3d 457 (2013). For this reason, "[i]n determining the scope of an express easement, the language of the grant is paramount in discerning the parties' intent." *Leposky* v. *Fenton*, 100 Conn. App. 774, 778, 919 A.2d 533 (2007). In addition, "[a]ny ambiguity in the instrument creating an easement, in a case of reasonable doubt, will be construed in favor of the grantee." *Mackin* v. *Mackin*, supra, 186 Conn. 189.

The plaintiffs first claim that the court misconstrued the Floeckher deed as limiting the plaintiffs' right-of-way to foot passage only. They argue that the court failed to properly apply the rules of construction in interpreting that deed. In particular, the plaintiffs contend that there is no ambiguity in the Floeckher deed and McNeil map and that those instruments created a general and unrestricted easement granting them the freedom to use lot 13 in any manner reasonably connected to the land. We conclude that the language used in the Floeckher deed, when considered in light of the situation of the parties, the properties, and the circumstances connected with the transaction, is clear and unambiguous. Accordingly, we agree with the plaintiffs that our standard of review is plenary and conclude, as a matter of law, that the plaintiffs' easement is not limited to foot passage only.

We begin our analysis with the language of the Floeckher deed, which provides in relevant part: "That that part of the land designated as Lot No. 13 as delineated on [the McNeil] map shall remain open as a right of way for the use and benefit of the grantee . . . ." The McNeil map, which is incorporated into the Floeck-

her deed by reference thereto, depicts lot 13 as a strip of land running from the end of Anchorage Drive to the "[approximate] mean high water [mark]." See Appendix 1 to this opinion. A pier is shown on the McNeil map extending from within the landward portion of lot 13 over the mean high-water mark and into Black Rock Harbor. Lot 13's border with Anchorage Drive is approximately twenty feet in width, and the parcel is approximately 400 feet long. The lot's shoreside border is about sixty-six feet in width.

Significantly, the Floeckher deed designates a "right of way" without limitation or reservation. The language, "open as a right of way for the use and benefit of the grantee" clearly reflects the grantor's intent to create a general right-of-way easement. The Floeckher deed contains no specifications of any particular manner in which lot 13 should be used and imposes no limitation on the scope of the easement. More particularly, the language does not limit the right-of-way to foot passage or to ingress and egress. Consequently, we conclude that the Floeckher deed and the McNeil map expressly grant a general right-of-way in terms that are clear and unambiguous.

It is well established that "[a] right of way granted or reserved in general terms may be used for any purpose reasonably necessary for the party entitled to use it. . . . The grant being general in terms, it must be construed to include any reasonable use to which the land may be devoted." (Internal quotation marks omitted.) *Peck* v. *Mackowsky*, 85 Conn. 190, 194, 82 A. 199 (1912); see also *Makin* v. *Makin*, supra, 186 Conn. 189 (easement created by grant in general terms without restrictions on use "is to be construed as broad enough to permit any use which is reasonably connected with the reasonable use of the land to which it is appurtenant" (internal quotation marks omitted)); *Birdsey* v. *Kosienski*, 140 Conn. 403, 413, 101 A.2d 274 (1953) (same); *Myers* v. *Dunn*, 49 Conn. 71, 78 (1881) (general grant conveys "unlimited way of necessity for all legal uses"). "The reasonable uses, to which the granted right-of-way may be put, need only be reasonably connected with the land and are not limited to those to which the land was being put when the way was granted. . . . For instance, the owner of an easement may use the easement in ways which take advantage of modern innovations such as commercial utilities." (Citations omitted; internal quotation marks omitted.) *Francini* v. *Goodspeed Airport, LLC*, 164 Conn. App. 279, 293, 134 A.3d 1278 (2016), aff'd, 327 Conn. 431, 174 A.3d 779 (2018).

Therefore, because the language of the Floeckher deed clearly and unambiguously created an easement in general terms without restrictions on its use, the scope of the easement includes "any use which is reasonably connected with the reasonable use of the land

to which [the easement] is appurtenant." (Internal quotation marks omitted.) *Makin* v. *Makin*, supra, 186 Conn. 189; see also *Peck* v. *Mackowsky*, supra, 85 Conn. 194; *Hagist* v. *Washburn*, 16 Conn. App. 83, 86, 546 A.2d 947 (1988).

Despite the general language of the Floeckher deed, the well established principles relating to such general grants, and the principle that "[a]ny ambiguity in the instrument creating an easement, in a case of reasonable doubt, will be construed in favor of the grantee"; *Mackin* v. *Mackin*, supra, 186 Conn. 189; the court in the present case held that the plaintiffs' easement constituted a "right of passage . . . limited to foot passage . . . ." At the outset of its decision, the court stated that "[t]here is no dispute that the plaintiffs are the beneficiaries of a private right-of-way over Green Power's property. What is at issue is the scope of the easement, which was created by deed in the late 1920s." The court then reasoned that "[t]he [Floeckher] deed that created the right-of-way contains two relevant clauses, section 4 and section 5. In section 4, the grantor created a nonexclusive right-of-way over Anchorage Drive. Section 4 provides 'that parcel of land on [the McNeil] map designated as Anchorage Drive shall remain open for appropriate street purposes and user for the use and benefit of the grantee . . . .' In section 5, the grantor created the right-of-way over lot 13. The grantor did not mention in section 5 'street purposes' or motor vehicle use. The inference raised by these omissions in section 5 is that the grantor did not intend to grant a right of vehicular passage over lot 13.

"Photographs from the early [1900s] of the area surrounding lot 13 do not show any vehicles on lot 13 or any evidence of vehicular use. A photograph from the 1910s shows a woman traversing lot 13 on foot from the shoreline toward Anchorage Drive. The [McNeil] map that is referenced in the [Floeckher] deed does not depict a beach area within the boundaries of lot 13. The map does not depict a place for recreation, a place to park vehicles, or a place for launching or storing boats. Photographs and a written history of the area show that to the south of the right-of-way there was a beach known as Money Beach. The inference is that the creator of the right-of-way intended to increase the value of the residential lots it was selling by granting purchasers a means of accessing the shore by foot passage over lot 13. This limited manner of access appears to be consistent with the manner in which lot 13 had been used before 1927. This court concludes that the [Floeckher] deed and the circumstances that existed at that time show that the grantor intended the right-of-way to be limited to foot passage from Anchorage Drive to the shore of Black Rock Harbor and from the shore back to Anchorage Drive." We conclude that the court's construction of the Floeckher deed was incorrect as a matter of law.

As an initial matter, we agree with the trial court that the obvious purpose that McNeil had in granting a right-of-way easement over lot 13 was to "increase the value of the residential lots" on the McNeil map "by granting purchasers a means of accessing the shore" of Black Rock Harbor. Nevertheless, given the language of the Floeckher deed conveying a "right of way for the use and benefit of the grantee," coupled with the absence of any limiting language in the grant, there is no support for the court's conclusion that the plaintiffs' easement is limited to foot passage only.[11]

" 'Right-of-way' is generally defined as 'a legal right of passage over another person's ground . . . .' " (Emphasis omitted.) *Double I Ltd. Partnership* v. *Plan & Zoning Commission*, 218 Conn. 65, 74, 588 A.2d 624 (1991); see also Black's Law Dictionary (11th Ed. 2019) p. 1587 (defining "right-of-way" as "[t]he right to pass through property owned by another"). Further, as emphasized throughout this opinion, "[a] right of way granted or reserved in general terms may be used for any purpose reasonably necessary for the party entitled to use it." (Internal quotation marks omitted.) *Peck* v. *Mackowsky*, supra, 85 Conn. 194. Accordingly, the plain language of the deed clearly and unambiguously created a *general* right-of-way, without restrictions on its use.[12] See, e.g., *Heuer* v. *Webster*, 187 Ill. App. 273, 274–76 (1914) (language of grant, " 'shall be and remain an open court for light, air, access and right of way, for the common benefit of the parties hereto,' " was plain and unambiguous); *Cox* v. *Glenbrook Co.*, 78 Nev. 254, 261–62, 371 P.2d 647 (1962) ("Here the grantor conveyed an easement [and right-of-way] with 'full right of use.' To our mind, that phrase is clear and without ambiguity. It may not, under the veil of interpretation, be considered to mean a 'restricted right of use.' ").

Thus, given both the obvious purpose of the easement and the general terms of the Floeckher deed, the court should have considered whether the plaintiffs' use of the easement was reasonable in light of the broad language of the grant. As this court has explained, "[i]n the context of an easement granted in general terms, we have applied the reasonable use factors to ascertain its proper scope because it is well settled that a right-of-way *granted in general terms* may be used for any purpose *reasonably necessary* for the party entitled to use it." (Emphasis in original; internal quotation marks omitted.) *Fitch* v. *Forsthoefel*, 194 Conn. App. 230, 238, 220 A.3d 876 (2019). In determining the scope of the easement, however, the court did not apply the reasonable use factors and, instead, limited its consideration to what it viewed as the circumstances that existed when the easement was granted. In so doing, the court failed to give effect to the plain and unambiguous language in the Floeckher deed. Furthermore, the court's conclusion as to the import of those surrounding cir-

cumstances was incorrect for several reasons.

First, the court's reliance on the right-of-way over Anchorage Drive was misplaced. The court read the inclusion of "street purposes" in paragraph 4 of the Floeckher deed, which granted a right-of-way to use Anchorage Drive, and the fact that no such language appears in paragraph 5, which granted the right-of-way over lot 13, as an indication that the grantor intended to permit vehicular traffic on Anchorage Drive but not over lot 13. We see no basis for such a conclusion. Paragraph 4 of the Floeckher deed provides in relevant part: "That that part of the land on [the McNeil] map designated as Anchorage Drive shall remain open for appropriate street purposes and user for the use and benefit of the grantee . . . ." This language plainly and unambiguously limits what use the grantees can make of Anchorage Drive. They may use Anchorage Drive only for "appropriate street purposes . . . ." No such limitation appears in paragraph 5, which provides in relevant part that "Lot No. 13 . . . shall remain open as a right of way for the use and benefit of the grantee . . . ." Consequently, contrary to the court's conclusion that the grant in paragraph 4 is broader than the grant in paragraph 5, the opposite is true. The fact that the grantor limited the scope of use in paragraph 4 to street purposes but included no such restriction in paragraph 5 confirms the broad and unrestricted nature of the easement granted as to lot 13.[13]

Second, the extratextual evidence of the surrounding circumstances relied on by the court does not support its conclusion. The fact that photographs of the area surrounding lot 13 from the time of the granting do not display vehicles or evidence of vehicular use on lot 13 does not lead to the conclusion that the grantors intended to prohibit passage via motor vehicle. The absence of evidence of a use does not definitively indicate an intent to preclude such use, especially where the grant of the easement was a general right-of-way. In fact, the photographs on which the court relied show no vehicles on Anchorage Drive, any of the surrounding streets, or parked at any of the homes in the area. Yet one would not infer that from the absence of vehicles in those areas that vehicular traffic was not permitted. Furthermore, that a means of traversing a right-of-way was not in use at the time of the granting does not indicate a prohibition against such a means of travel. See *Francini* v. *Goodspeed Airport, LLC*, supra, 164 Conn. App. 293 ("[t]he reasonable uses, to which the granted right-of-way may be put . . . are not limited to those to which the land was being put when the way was granted" (internal quotation marks omitted)); *Rowe* v. *Lavanway*, 180 Vt. 505, 511–12, 904 A.2d 78 (2006) ("[t]he manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate" (internal quotation marks

omitted)); *Wagoner* v. *Jack's Creek Coal Corp.*, 199 Va. 741, 744, 101 S.E.2d 627 (1958) ("the beneficiary of the right is not restricted to the type of vehicles or mode of travel existing at the time the easement was created").

Likewise, the court's reliance on a photograph from 1910 displaying a woman walking on the Bridgeport Yacht Club wharf toward the beach provides no evidence of McNeil's intent years later when he acquired and subdivided the property that once was the yacht club. As the court, quoting *McBurney* v. *Paquin*, 302 Conn. 359, 379, 28 A.3d 272 (2011), noted in its memorandum of decision: " 'Evidence of the lot owners' current use of the [easement], as well as use in other periods far removed [in time] from the creation of the [easement], is not reasonably viewed as part of the surrounding circumstances.' " Furthermore, as with the photographs that show no automobiles, the fact that an individual is walking along the way does not lead to the conclusion that the right-of-way may be used solely for foot passage. The photograph reveals nothing about the intent of the grantor, as it could easily be concluded that walking was one of the many permissible uses of the right-of-way. In addition, the photograph of a woman on the wharf reveals nothing about how the woman arrived there or whether she even traveled the 400 feet over lot 13 to arrive to the wharf.

Third, we disagree with the court's conclusion that the McNeil map did not "depict a place for recreation, a place to park vehicles, or a place for launching or storing boats." Although the map does not have specific portions of lot 13 designated for recreation and parking, it is undisputed that lot 13 is large enough to accommodate such activities. Lot 13 is approximately twenty feet wide on the western border, 400 feet long on the northern and southern borders, and sixty-six feet wide on the eastern border. The easement expressly states that "that part of the land designated as Lot No. 13 as delineated on [the McNeil] map shall remain open as a right of way for the use and benefit of the grantee . . . ." Thus, as recognized by the defendants, the right-of-way extends over the entirety of lot 13. In the absence of any indication otherwise, it is unreasonable to presume that an easement twenty feet wide at its entrance and 400 feet long was intended to be limited to foot traffic. See, e.g., *Mazzola* v. *O'Brien*, 100 Mass. App. 424, 428, 178 N.E.3d 870 (2021) ("Where nothing in the easement language or the objective circumstances supports an express limitation, the easement 'may be used for such purposes as are reasonably necessary to the full enjoyment of the premises to which the right of way is appurtenant' . . . . Especially where the easement is 450 feet long, a distance that is difficult or impossible for some to walk, using ATVs to transport people and equipment to the beach is a reasonably necessary use." (Citations omitted.)). The fact that lot 13 is large enough to accommodate parking and recre-

ational activities is further evidenced by the plaintiffs and others using it for such purposes for decades. Furthermore, accepting the court's reasoning would mean that every map incorporated into a deed granting a right-of-way must list or depict in exhaustive detail all the reasonable uses of an easement and that, where such a use is not depicted or listed, it is prohibited. This is contrary to the well established law in this state that "a right-of-way granted in general terms may be used for any purpose reasonably necessary for the party entitled to use it." *Hagist* v. *Washburn*, supra, 16 Conn. App. 86. Moreover, the McNeil map *did*, in fact, depict a place for recreation in that it depicted a pier extending from the landward side of lot 13 into Black Rock Harbor.

Finally, although the court found that "[t]he only manner in which one may enter and leave 141 Anchorage Drive by motor vehicle is by passing over lot 13 . . . to Anchorage Drive" and that McNeil, less than one year after executing the Floeckher deed, granted himself the same easement over lot 13 that he had granted in the Floeckher deed, the court did not consider those facts in its consideration of the situation of the properties and the surrounding circumstances. Those facts, however, undermine the court's conclusion that the easement is limited to foot passage only. Indeed, they support the opposite inference—that McNeil, the grantor in the Floeckher deed, understood that the easement over lot 13 included the right to travel by motor vehicle because he granted himself the same easement appurtenant to 141 Anchorage Drive as the only means of accessing his residence by motor vehicle.[14] Accordingly, the evidence of the surrounding circumstances does not support the court's conclusion that the scope of the easement in the Floeckher deed was "limited to foot passage from Anchorage Drive to the shore of Black Rock Harbor and from the shore back to Anchorage Drive."

In sum, on the basis of the plain and unambiguous language of the Floeckher deed, which expressly grants an open right-of-way in general terms without restrictions on its use, the scope of the plaintiffs' right-of-way "must be construed to include any reasonable use to which the land may be devoted." (Internal quotation marks omitted.) *Francini* v. *Goodspeed Airport, LLC*, supra, 164 Conn. App. 293. In other words, because nothing in the language granting the express easement or the objective circumstances surrounding the grant indicates an intent to impose any limitation on the use of the right-of-way, the scope of the easement is such that it may be used for those purposes reasonably necessary to the full enjoyment of the premises to which the right-of-way is appurtenant. Whether a particular use is reasonable is a question of fact and must "be determined on a case by case basis, considering all the relevant circumstances, including such factors as the amount of harm caused, its foreseeability, the purpose or motive with which the act was done, and the consid-

eration of whether the utility of the use of the land outweighed the gravity of the harm resulting." (Internal quotation marks omitted.) *Hagist* v. *Washburn*, supra, 16 Conn. App. 86; see also *Fitch* v. *Forsthoefel*, supra, 194 Conn. App. 238.

As previously noted in this opinion, the plaintiffs' complaint sought a declaratory judgment that the defendants' activities on 145 Anchorage Drive had interfered with their use and enjoyment of the easement. "Except as limited by the terms of the servitude . . . the holder of an easement . . . is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. . . . Likewise, [e]xcept as limited by the terms of the servitude . . . the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude." (Internal quotation marks omitted.) *57 Broad Street Stamford, LLC* v. *Summer House Owners, LLC*, supra, 184 Conn. App. 841. Accordingly, to resolve the plaintiffs' claims, the trial court was required to determine (1) the character, extent, and scope of the easement granted to the plaintiffs, (2) whether the plaintiffs' use of the easement was reasonable in light of the character and extent of the easement, and (3) whether the defendants' actions had interfered with the plaintiffs' use of the easement. Because the court failed to give proper effect to the general and unrestricted language of the Floeckher deed, it failed to consider whether the plaintiffs' uses of the easement were reasonable. As a result, the court's analysis of the parties' claims was distorted by its misconstruction of the Floeckher deed as limiting the permissible use of the easement to foot passage only. Consequently, because the court's erroneous construction of the Floeckher deed necessarily affected the court's analysis of the parties' claims, except for the plaintiffs' trespass claim,[15] a new trial is required.[16]

The judgment is reversed as to the first, second, and fourth counts of the plaintiffs' complaint and as to the counterclaim and those matters are remanded for a new trial; the judgment is affirmed as to the third count of the plaintiffs' complaint.

In this opinion the other judges concurred.

[1] The court held that the defendants are jointly and severally liable for the token damages.

[2] The court rendered judgment for the defendants on the plaintiffs' trespass claim, and the plaintiffs do not challenge that portion of the court's judgment. Accordingly, we affirm the court's judgment for the defendants on that count.

[3] The following narrative describes the early history of the properties at issue in the present case. "The sandy point on the waterfront property at the end of Anchorage Drive had been called 'Money Beach' from the time of the colonies. There was a hopeful legend that pirates had once buried treasure on the beach, but treasure was never found there. Some time after 1764, Captain John Squire built a wharf at the beach—'Squire's Wharf.' This was the 'lower wharf,' the first one encountered when sailing into the harbor. During the [latter] part of the nineteenth century, the Money Beach property was owned by the brothers Joseph and Thomas Burr Bartram. It was Joseph's son, J. Percy Bartram, who [in] about 1904 built the waterfront estate called

'The Anchorage . . .' [o]n . . . property . . . which then bordered the Bridgeport Yacht Club . . . ." Black Rock: A Bicentennial Picture Book (D. Jones ed., 1976) p. 42.

"The Bridgeport Yacht Club was located at the end of Anchorage Drive on waterfront land purchased by the club founders from the Bartram family. . . . The club building was an imposing structure, three stories high and surrounded by a broad, two-story veranda. . . . In front of the clubhouse there was a large wharf for boating and a sandy beach for swimming. The three hundred club members maintained a fleet of steamers, naptha launches, schooners, sloops, cutters, yawls, and cat-rigged boats. . . .

"The decline of the Bridgeport Yacht Club began about 1910, when the twin advent of the automobile and the country club turned sportsmen's interests away from yachting. During World War I the clubhouse was used as a Naval Reserve barracks. In 1923 when the building was torn down, sections were salvaged and converted into summer houses. One still stands at the site of the original clubhouse location at 123 Anchorage Drive, and another was moved to the corner of Grovers Avenue." Id., 40.

[4] In this context "user" means "[t]he exercise or employment of a right or property"; for example, "the neighbor argued that an easement arose by his continuous user over the last 15 years." Black's Law Dictionary (11th Ed. 2019) p. 1856.

[5] A similar grant of easement was executed for the benefit of Hincks.

[6] The March 2, 1918 deed identified in the grant is the warranty deed conveying the Anchorage property from J. Percy Bartram to McNeil.

[7] The defendants contended that the plaintiffs' argument was based on a theory of expanding the scope of their deeded easement by prescriptive use. At no point, however, did the plaintiffs rely on prescriptive use to advance their claims. Rather, the plaintiffs argued that their use of the easement always had been permissible. They pointed to the history of the use and the fact that the original grantor—the McNeil Corporation, which owned lot 13 for about ninety years—did not protest such use, as evidence that the McNeil Corporation intended such use to be within the scope of the easement.

[8] The defendants did not appeal or cross appeal from the court's order barring them from filing the declaration on the Bridgeport land records. We note that, in February, 2023, the plaintiffs filed in the trial court a motion for contempt in which they alleged that the defendants had filed an improper declaration on the Bridgeport land records in violation of the court's order. As of September 13, 2023, that motion remains pending before the trial court.

[9] On July 13, 2022, the plaintiffs filed a motion for articulation in which they asked the court to articulate the factual and legal basis for its determination that the easement was limited to foot passage only. On July 13, 2022, the court, *Stevens*, *J.*, denied the motion, as Judge Thim had retired on June 30, 2022. On July 27, 2022, the plaintiffs filed a motion for review of the court's denial of their motion for articulation. On September 28, 2022, this court granted review but denied the relief requested.

[10] According to the defendants, "[t]he trial court's decision that [the plaintiffs] have the right to cross over the ground of lot 13 . . . involves the [plaintiffs'] right to make use of the landward, rather than seaward, side of the high-water mark." (Emphasis omitted.)

[11] Considering the nature of general right-of-way easements and the well established principles indicating that such general grants permit all reasonable uses of the land to which the easement is appurtenant, we disagree with the defendants' contention that the court was not required to point to evidence giving rise to a conclusion that the grantors intended the easement be limited to foot traffic only.

[12] The defendants contend that there was a latent ambiguity within the Floeckher deed arising from extraneous facts in the case. They fail, however, to identify any such extraneous facts giving rise to the ambiguity. "A latent ambiguity arises from extraneous or collateral facts that make the meaning of a deed uncertain although its language is clear and unambiguous on its face. . . . Latent ambiguity exists where, although language in a deed appears to be certain on its face, it is rendered uncertain when compared to the land that it is purported to describe." (Citation omitted; internal quotation marks omitted.) *Stefanoni* v. *Duncan*, 282 Conn. 686, 704, 923 A.2d 737 (2007).

In the present case, the Floeckher deed expressly granted the right-of-way over the entirety of lot 13. Nothing in the physical situation of the lot renders that grant ambiguous. In addition, as discussed further in this opinion, nothing in the circumstances surrounding the grant supports the conclu-

sion that the right-of-way was limited to pedestrian passage only.

[13] We also fail to see a basis for the court's conclusion that " 'street purposes' " is synonymous with motor vehicle use. Streets are used not just by motor vehicles but also by bicycles and pedestrians. This would have been especially true in 1927 when motor vehicles were a relatively new mode of transportation. Thus, if, as the court concluded, Anchorage Drive could be used for " 'street purposes' " but lot 13 could not, the result would be that the grantee of the broad unrestricted right-of-way over lot 13 would have no way of traversing it, rendering it meaningless. We will not adopt a construction of a deed that would lead to such an absurd result. See *Freidheim* v. *McLaughlin*, 217 Conn. App. 767, 791, 290 A.3d 801 (2023) ("in giving meaning to the language of the deed, we presume that the parties did not intend to create an absurd result" (internal quotation marks omitted)).

[14] The plaintiffs note this point in their reply brief, arguing that "[i]t is not possible that McNeil would use the same language he used in granting an easement to the plaintiffs' predecessor in interest, [Floeckher] . . . to mean that he and Hincks had the right to drive cars from their parcels over lot 13 to access Anchorage Drive going west, or the water and the pier going east, but the twelve easement holders had to park on Anchorage Drive . . . and then walk to the water because their easements were limited to foot traffic only." (Citation omitted.)

[15] The court held that the plaintiffs failed to prove their trespass claim because they are not in exclusive possession of 145 Anchorage Drive, which is a necessary predicate to such a claim. See *Rickel* v. *Komaromi*, 144 Conn. App. 775, 782, 73 A.3d 851 (2013) ("it is the right of the owner in possession to exclusive possession that is protected by an action for trespass" (internal quotation marks omitted)). As previously noted in this opinion, the plaintiffs do not challenge the court's judgment as to their trespass claim. See footnote 2 of this opinion.

[16] Although the plaintiffs invite this court to conclude, as a matter of law, "that the defendants' gates and fences across the right-of-way interfere with the plaintiffs' use and enjoyment of their easement," we decline to do so.

Where a grant or reservation of an express easement demonstrates an intention that no fence or gate shall be erected, it is controlling. See, e.g., *Mineral Springs Mfg. Co.* v. *McCarthy*, 67 Conn. 279, 285, 34 A. 1043 (1896) (where grant of right-of-way expressly stated that way was "not to be incumbered in any way, or by any person whatever," owner of servient estate could not lawfully prevent owner of dominant estate from permanently removing gate obstructing way (internal quotation marks omitted)). In the absence of any express intention to preclude gates or fences, the right of the owner of the servient estate to erect a gate depends on whether it unreasonably interferes with the dominant estate's enjoyment of the easement. See *Kelly* v. *Ivler*, 187 Conn. 31, 48–49, 450 A.2d 817 (1982) ("[w]e cannot say, after viewing the photographs included as exhibits and in light of the use of the easement, that the fence materially or substantially interferes with pedestrian passage over the easement"); see also id., 49 n.7 (noting that, "[h]ad the purpose of the . . . easement been to provide for automobile or other means of travel to the beach area, [the slight] encroachment might very well materially or substantially interfere with its reasonable enjoyment"); *57 Broad Street Stamford, LLC* v. *Summer House Owners, LLC*, supra, 184 Conn. App. 844, 846 (court properly concluded that construction of service access structure did not impair plaintiffs' easement rights where "nothing in the language of the declaration prohibit[ed] the construction of permanent structures within the easement area" and "plaintiffs still [were] able to access their unit and make improvements").

The Floeckher deed states that lot 13 is to "remain open as a right of way . . . ." Such language does not, as a matter of law, preclude an access gate or fence. Thus, in light of our remand for a new trial, the trial court must determine whether the defendants' fence and gates across the entrance of lot 13 unreasonably interfere with the plaintiffs' enjoyment of the right-of-way.

APPENDIX 1



APPENDIX 2

